W. Chris Wicker  (State Bar No. 1037)
WOODBURN AND WEDGE
6100 Neil, Road, Suite 500
Post Office Box 2311
Reno, Nevada 89511
Telephone:  (775) 688-3000
Facsimile: (775) 688-3088
cwicker@woodburnandwedge.com

Attorneys for National Council of
La Raza, Las Vegas Branch of the NAACP
(Branch 1111), Reno-Sparks Branch of
the NAACP (Branch 1112)

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

NATIONAL COUNCIL OF LA RAZA, LAS VEGAS BRANCH OF THE NAACP (BRANCH 1111), and RENO-SPARKS BRANCH OF THE NAACP (BRANCH 1112),

Plaintiffs,

v.

ROSS MILLER, *in his official capacity as Secretary of State of the State of Nevada; and* MICHAEL WILLDEN, *in his official capacity as Director of the Department of Health & Human Services of the State of Nevada,*

Defendants.

Case No. 3:12-cv-00316-RCJ-VPC

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## PRELIMINARY STATEMENT

Plaintiffs, NATIONAL COUNCIL OF LA RAZA, LAS VEGAS BRANCH OF THE NAACP (BRANCH 1111), and RENO-SPARKS BRANCH OF THE NAACP (BRANCH 1112), by their undersigned counsel, submit this Memorandum in support of their motion for a preliminary injunction requiring Defendants, ROSS MILLER, *in his official capacity as Secretary of State of the State of Nevada* ("Miller"); *and* MICHAEL WILLDEN, *in his*

*official capacity as Director of the Department of Health & Human Services of the State of Nevada* ("Willden"), to implement immediately and completely the mandatory provisions of Section 7 of the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. § 1973gg-5, and to take measures to remedy past and ongoing, and preclude future, violations of Section 7. Preliminary injunctive relief is necessary to provide meaningful relief in advance of the upcoming presidential election in November and the State's October deadline for registering to vote in that election. Thus, Plaintiffs request that the Court convene a hearing on this matter at its earliest convenience. *See also Plaintiffs' Motion to Immediately Convene a Scheduling Conference to Set Briefing and Hearing on the Motion for Preliminary Injunction and to Order Limited Expedited Discovery*, filed July 6, 2012.

## STATEMENT OF FACTS[1]

A bipartisan Congress enacted the NVRA in 1993 to increase the number of citizens registered to vote, and thereby enhance voter participation in federal elections. The House Committee on House Administration expressed concern at the time of the NVRA's enactment that "low voter turnout in Federal elections poses potential serious problems in our democratic society." H.R. REP. NO. 103-9, at *4 (1993). The same committee determined that "failure to become registered is the primary reason given by eligible citizens for not voting." *Id.* at *3. The Senate Committee on Rules and Administration expressed dismay that there were "almost 70 million eligible citizens who did not participate in the 1992 Presidential election because they were not registered to vote." S. REP. NO. 103-6, at *2 (1993). The House Committee ultimately concluded that "Congress should assist in reducing barriers, particularly government-imposed barriers, to applying for registration wherever possible." H.R. REP. NO. 103-9, at *3.

---

[1] This Statement of Facts is drawn from the Complaint in this action and the Declarations submitted herewith. Accompanying this Memorandum of Law are the Declarations of Sabrina Khan, sworn to on July 6, 2012, Ex. 1; Sheila Confer, sworn to on June 19, 2012; Ex. 2, Kendra Hulbert, sworn to on June 20, 2012, Ex. 3; and Denisha Phillips, sworn to on June 19, 2012, Ex. 4. By separate motion, plaintiffs seek an order for limited expedited discovery from the Court.

1    It was with these concerns in mind that Congress enacted the NVRA.  The NVRA

2  requires states to increase voter registration opportunities in several ways, including: making

3  registration available by mail; requiring that states include a voter registration form as part of

4  all drivers' license applications; and requiring that voter registration services be provided at

5  public assistance offices, disability offices, and other locations.  42 U.S.C. § 1973gg-3,

6  1973gg-5.  Nevada, however, is not complying with the requirement to provide voter

7  registration services at public assistance offices.

8    Section 7 of the NVRA requires, *inter alia,* that each state designate certain agencies,

9  including "all offices in the State that provide public assistance"[2] and offices providing

10  services to persons with disabilities, as "voter registration agencies." 42 U.S.C. § 1973gg-

11  5(a)(2).  All voter registration agencies must distribute voter registration applications, assist

12  with the completion of the applications unless the applicant refuses such assistance, and

13  accept the completed applications for transmittal to the appropriate election official.   42

14  U.S.C. § 1973gg-5(a)(4)(A).  Agencies providing public assistance and disability services

15  must meet additional criteria.  They must distribute a voter registration application with every

16  application, recertification, renewal, or change of address with respect to public assistance

17  ("covered transactions"), unless the applicant, in writing, declines to register to vote; provide

18  a form (the "voter preference form") that includes the question, "If you are not registered to

19  vote where you live now, would you like to apply to register to vote here today?" (the "voter

20  preference question") with yes/no checkboxes and several required statements; and provide

21  applicants with the same degree of assistance in completing the voter registration application

22

---

23  [2] The Department of Justice defines "public assistance" offices as "each agency and office in a State that
administers or provides services or assistance under any public assistance programs. This includes any of the

24  following federal public assistance programs: the Supplemental Nutrition Assistance Program (SNAP, formerly
the Food-Stamp Program), the Special Supplemental Nutrition Program for Women, Infants and Children

25  (WIC), the Temporary Assistance for Needy Families (TANF) program (formerly the Aid to Families with
Dependent Children or AFDC program), the Medicaid program, and the State Children's Health Insurance

26  Program (SCHIP). This also includes state public assistance programs."  Department of Justice, The National
Voter    Registration    Act    of    1993    (NVRA):    Questions    and    Answers,    *available    at*

27  http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php.

28

1  that they provide in completing the office's own forms.  42 U.S.C. § 1973gg-5(a)(6); *see also*

2  NEV. REV. STAT. § 293.504 (codifying the NVRA into state law).

3    Congress considered Section 7 necessary to ensure the registration of "the poor and

4  persons with disabilities who do not have driver's licenses and will not come into contact with

5  the other principal place to register under this Act [motor vehicle agencies]." H.R. Rep. No.

6  103-66, at *19 (1993) (Conf. Rep.) (NVRA Conference Report); *see also,* 42 U.S.C. §

7  1973gg(b)(1).  Moreover, because low-income citizens and citizens with disabilities are

8  among those least likely to own motor vehicles, they are also the groups least able to take

9  advantage of voter registration through other bureaucratic agencies that either are required to

10  or voluntarily provide voter registration opportunities.  As a result, any failure to implement

11  the procedures required by Section 7 will have a disproportionate impact upon low-income

12  citizens, who are entitled, under federal law, to register to vote at state-designated voter

13  registration agencies.

14    Defendants are responsible for implementing Section 7.  Willden is the Director of

15  Nevada's Department of Health and Human Services ("DHHS").  DHHS administers the

16  provision of benefits under the Supplemental Nutrition Assistance Program ("SNAP"),

17  Medicaid and Temporary Assistance for Needy Families ("TANF") through its Division of

18  Welfare and Supportive Services ("DWSS"), which is organized into local county offices

19  around the State of Nevada.  DHHS administers the Women, Infants and Children ("WIC")

20  program through its Nevada State Health Division ("NSHD"), Bureau of Child, Family and

21  Community Wellness ("BCFCW").  Each local office of the Department of Health and

22  Human Services that administers these programs is a voter registration agency required to

23  comply with Section 7 of the NVRA.

24    Miller is the chief election official in Nevada and is responsible for overseeing federal

25  elections in Nevada.  In his official capacity, among other things, Mr. Miller: promulgates

26  regulations; issues directives and advisories regarding procedures for conducting federal

27  elections; prescribes voter registration forms and makes them available for distribution;

28

1   establishes and maintains statewide qualified voter files; develops and implements rules,

2   practices and policies to enforce laws governing federal elections; investigates, or causes to be

3   investigated, compliance with governing election laws; and is responsible for ensuring

4   compliance with the NVRA.  He is the "chief election official" responsible for coordination of

5   Nevada's responsibilities under the NVRA. NEV. REV. STAT. § 293.504.

6        Data from the United States Census Bureau indicates that Nevada public assistance

7   offices are not performing their voter registration obligations under the NVRA.  According to

8   the Census Bureau's November 2010 Current Population Survey, only 47.6% of eligible

9   Nevada citizens living in a household with a yearly income of less than $25,000 were

10  registered to vote compared to 72.4% of eligible citizens living in a household with a yearly

11  income of more than $100,000 – a "voter registration gap" of 24.8%.  *See* November 2010

12  Current Population Survey, DataFerrett, at http://dataferrett.census.gov.

13       Nevada's own reports to the U.S. Election Assistance Commission ("EAC") reveal

14  that Nevada public assistance offices submitted only 1,677 voter registration applications in

15  the 2009-2010 reporting period. *See* U.S. Election Assistance Commission, *The Impact of the*

16  *National Voter Registration Act of 1993 on the Administration of Elections for Federal Office*

17  *2009-2010*,        39        (June        30,        2011),        *available        at*

18  http://www.eac.gov/research/national_voter_registration_act_studies.aspx. ("2011 EAC

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

1  Report").  This represents a 95.7 percent decline since 2001-2002, when Nevada reported

2  39,444 registrations from public assistance offices.[3] Fed. Election Comm'n, *The Impact of the*

3  *National Voter Registration Act on the Administration of Elections for Federal Office, 2001-*

4  *2002*,        at        Table        2        (2003),        available        at

5  http://www.eac.gov/research/national_voter_registration_act_studies.aspx.

6         Further, the overall trend in voter registration through public assistance agencies in

7  Nevada has been negative since implementation of the NVRA.   The number of voter

8  registration applications through public assistance agencies reported to the EAC during each

9  reporting period is as follows:

10

| Year | Public Assistance Voter Reg. Applications |
|------|-------------------------------------------|
| 1995-1996 | 13,200 |
| 1997-1998 | No report |

16

[3]  By contrast, experience in other states has demonstrated a direct correlation between public agencies' compliance with their NVRA obligations and the number of voter registration applications submitted through these agencies. Enforced NVRA compliance at these agencies results in substantial gains in the number of public assistance clients who register to vote. For example, during the two-year period from 2005 to 2006, fewer than 16,000 individuals registered to vote through Missouri's public assistance offices.  U.S. Election Assistance Commission, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2005-2006*, 34 (June 30, 2007), available at http://www.eac.gov/research/national_voter_registration_act_studies.aspx. However, as a result of a preliminary injunction order directing state public assistance offices to comply with Section 7 of the NVRA, *see ACORN v. Scott*, No. 08-CV-4084-NKL, Doc. 99, Mem. and Order, at 19 (W.D. Mo. July 15, 2008), significantly higher numbers of public assistance clients registering to vote. In 2009 and 2010, Missouri's public assistance agencies collected more than 120,000 voter registration applications — a 750% increase over pre-injunction numbers. *See* 2011 EAC Report.

Similarly, in Ohio, public assistance agencies submitted 42,599 voter registration applications in 2005 and 2006, or about 21,000 per year.  *See* U.S. Election Assistance Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 2005-2006*, at Table 2b (2007), available at http://www.eac.gov/research/national_voter_registration_act_studies.aspx. However, following a lawsuit filed in 2006 and settled in 2009, the state's public assistance agencies were required to increase efforts to comply with their NVRA obligations. *See Harkless v. Brunner*, No. 1:06-CV-2284, Settlement Agreement (N.D. Ohio Nov. 25, 2009). Subsequently, the number of voter registration applications submitted through these agencies increased substantially. In 2009 and 2010, Ohio's public assistance agencies collected 246,923 voter registration forms, *see* 2011 EAC Report, representing a six-fold increase from the period from 2005-2006. Clearly, compliance with all the requirements of Section 7 significantly improves the number of voter registration applications generated from public assistance offices.

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

| 1999-2000 | 2,883 |
| 2001-2002 | 39,444 |
| 2003-2004 | 6,389 |
| 2005-2006 | 3,307 |
| 2007-2008 | 4,301 |
| 2009-2010 | 1,677[4] |

Recent interviews with clients and workers at public assistance offices confirm that Nevada public assistance offices regularly fail to offer voter registration. Interviews of public assistance clients and state workers conducted in December 2011 at nine DWSS and WIC offices in Nevada's primary population centers of Carson City, Las Vegas, and Reno, as well as observations at those offices, show that Nevada is violating Section 7 of the NVRA.

> A. *Failure to offer voter registration opportunities.* Of the fifty-three public assistance clients interviewed following a covered transaction, 27 of the interviewees (more than half) were not asked by office staff whether they wanted to register to vote. *See* Ex. A, Khan Dec., ¶¶ 5(b), 6(b), 7(b), 8(b), 8(c), 11(b), 12(b) & 13(b). Three clients remembered checking "Yes" to the voter preference question but none of them received a voter registration application. *See* Ex. A, Khan Dec. ¶ ¶ 11(b), 13(b) & 13(c). An office employee only spoke to one of those three clients about voter registration at all. *See id.* Finally, twelve clients left the voter preference question blank and none were asked by an employee if they wanted to register to vote and none

---

[4] Source of the data shown in the Chart is bi-annual reports for years shown from the Federal Election Commission and Election Assistance Commission, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office.* Fed. Election Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 1995-1996*, at Table 2 (1997); Fed. Election Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 1997-1998*, at Table 2 (1999); Fed. Election Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 1999-2000*, at Table 2 (2001); Fed. Election Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 2001-2002*, at Table 2 (2003); U.S. Election Assistance Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 2003-2004*, at Table 2 (2005); U.S. Election Assistance Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 2005-2006*, at Table 2b (2007); U.S. Election Assistance Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 2007-2008*, at Table 2b (2009). *See* U.S. Election Assistance Commission, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2009-2010*, 39 (June 30, 2011). All of these studies are available at http://www.eac.gov/research/national_voter_registration_act_studies.aspx.

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

were given a voter registration application. *See* Ex. A, Khan Dec. ¶¶ 5(b), 6(b), 7(b), 8(b), 11(b) & 12(b).

B.  *Failure to distribute voter registration applications.*   In four of the DHHS office visited, the clerks stated that voter registration applications are provided only to clients who check "Yes" in response to the question whether they "would . . . like to register to vote here today," despite the NVRA and Nevada law requirement that all persons engaging in covered transactions receive a voter registration form application unless they specifically decline, in writing, to receive such an application. *See* Ex. A, Khan Dec., ¶¶5(a), 11(a), 12(a) & 13(a).

C.  *Failure to keep voter registration applications and materials in supply and generally available.*   Three of the sites visited did not have any voter registration applications in the office to provide to clients who engaged in transactions covered by the NVRA. *See* Ex. A, Khan Dec., ¶¶ 7(a), 8(a) & 10(a). One WIC office had not had voter registration forms for over one year, *see* Ex. A, Khan Dec., ¶10(a), while the other WIC office had not had voter registration forms for over two years. *See* Ex. A, Khan Dec., ¶8(a). Additionally, one office with a large Spanish speaking clientele did not have any Spanish language voter registration applications available. *See* Ex. A, Khan Dec., ¶6(a). Furthermore, most of the sites visited did not display voter registration applications in their waiting areas. *See* A, Khan Dec., ¶¶6(a), 7(a), 8(a), 9(a), 10(a), 11(a) & 12(a).

On May 10, 2012, a letter was sent to Miller, on behalf of the "National Council of La Raza, Las Vegas Branch of the NAACP (Branch 1111), and Reno-Sparks Branch of the NAACP (Branch 1112) (collectively the "Plaintiffs"), persons eligible to register to vote who they represent, and others similarly situated" to "provide written notice that the State of Nevada is not in compliance with Section 7 of the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. § 1973gg-5." The notice warned that, unless Nevada implemented a plan to remedy the violations of the NVRA within 20 days, NCLR, the Las Vegas NAACP, and the Reno-Sparks NAACP would commence litigation. (A copy of the May 10, 2012 notice letter is attached to the Complaint as Exhibit A.) Willden was sent a copy of the notice on the same day. The violations of the NVRA described in the notice letter have not been remedied.

On May 22, 2012 a representative from the Nevada Secretary of State's Elections Division contacted a representative of Plaintiffs, seeking an extension of time in which to

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

1   respond to the May 10 notice letter and seeking to delay initial meetings with state officials
2   until after the June 12 primary.   In a May 24 e-mail response to this request, plaintiffs'
3   representatives agreed to permit the delay in meeting with state elections officers, provided
4   that the state (1) provide a current organizational chart for the DHHS, the DWSS, and WIC,
5   as well as any management evaluation forms for those Departments/Divisions, and (2) arrange
6   a meeting with the person or persons within DHHS with the most knowledge regarding
7   NVRA implementation on or before the first week in June.   On June 5, the Nevada Secretary
8   of State's Elections Division responded to the May 24 proposal, indicating that they would
9   not comply with the request.

10          The evidence demonstrates that Defendants, who are collectively charged with
11   responsibility for Nevada's compliance with the NVRA, have failed and continue to fail to
12   ensure that the state fulfills its duties as mandated by Section 7.   Specifically, public
13   assistance offices are not providing applicants, or those re-certifying or changing an address
14   for public assistance benefits, the opportunity to register to vote as the NVRA requires.
15   Indeed, this is demonstrated by the declarations attached hereto.   For example, on June 19,
16   2012, Sheila Confer, a Las Vegas resident, visited the WIC office on 6480 W. Flamingo Road
17   in Las Vegas.   Though she was there for recertification of her benefits – a covered transaction
18   under the NVRA – she was not offered the opportunity to register to vote.   *See* Ex. B, Confer
19   Decl. ¶3.   On that same day, Denisha Phillips renewed her benefits at the DWSS office at
20   1040 Owens Avenue in Las Vegas.   Though she indicated that she wished to register to vote,
21   no employee offered her an opportunity to do so.   *See* Ex. D, Phillips Decl. ¶3 On June 20,
22   2012, Kendra Hulbert visited the DWSS office at 2533 N. Carson Street in Carson City to
23   recertify her benefits.   She was not offered voter registration.   *See* Ex. C, Hulbert Decl. ¶3

24          The Plaintiffs are nonprofit organizations that, among other services, have committed
25   and continue to commit time and personnel to encourage and facilitate voter registration
26   among minority and low-income citizens of Nevada, including registration of individuals who
27   receive or apply for public assistance benefits.

28

1    Accordingly, Plaintiffs seek injunctive relief to ensure that the State of Nevada

2   complies with Section 7, and that the fundamental right to vote of every Nevada citizen is

3   protected.

4                              **ARGUMENT**

5    Courts in this Circuit recognize two standards for evaluating claims for injunctive

6   relief. Under the "traditional" test, a party seeking a preliminary injunction must establish: 1)

7   that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the

8   absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an

9   injunction is in the public interest. *Greater Yellowstone Coalition v. Timchak*, No. 08-cv-

10  36018, 2009 WL 971474, at *1 (9th Cir. April 10, 2009) (citing *Winter v. Natural Res. Def.*

11  *Counsel, Inc.*, 55 U.S. 7, 20 (2008)). Additionally, courts apply "an alternative 'sliding-

12  scale' test under which a preliminary injunction may be granted where the plaintiff

13  'demonstrates either a combination of probable success on the merits and the possibility of

14  irreparable injury or that serious questions are raised and the balance of hardships tips

15  sharply in his favor.'" *Id.* (cited cases omitted).

16    Where, as here, Congress expressly provides for injunctive relief to prevent violations

17  of a federal statute, the "standard requirements for equitable relief need not be satisfied . . . ."

18  *Trailer Train*, 697 F.2d at 869 (citing *Atchison, Topeka & Santa Fe Ry. v. Lennen*, 640 F.2d

19  255, 259-61 (10th Cir. 1981) and *United States v. City and Cnty of S.F.*, 310 U.S. 16, 30-31,

20  84 L.Ed. 1050, 60 S. Ct. 749, 757 (1940)). Instead, the court simply applies the statute to

21  prevent the violation. *See Lathan v. Volpe*, 455 F.2d 1111, 1116 (9th Cir. 1971) (remanding

22  to the district court to order the injunction where the court, relying on *United States v. City*

23  *and County of San Francisco*, found that application of the statute required an injunction to

24  protect plaintiffs), *overruled on other grounds by Lathan v. Brinegar*, 506 F.2d 677 (9th Cir.

25  1974).

26  ///

27  ///

28

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

I.    **PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION BECAUSE CONGRESS EXPRESSLY PROVIDED FOR INJUNCTIVE RELIEF**

The NVRA expressly provides that the Attorney General or a private party may "bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to [a violation of the NVRA]."  42 U.S.C. § 1973gg-9(b)(2).  Given Congress's express provision of injunctive relief, the NVRA "clearly falls within this exception because its subsection [1973gg-9] specifically authorizes a district court to grant injunctive relief to prevent a violation of the statute." *Trailer Train*, 697 F.2d at 869.

It is a well-established rule that where Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff need not demonstrate irreparable harm to secure an injunction. *See City and Cnty. of S.F.*, 310 U.S. at 30, 84 L.Ed. 1050, 60 S.Ct. at 757 (determining that, where a statute allows for injunctive relief, "we are satisfied that this case does not call for a balancing of equities or for the invocation of the generalities of judicial maxims in order to determine whether an injunction should have issued").  In such situations, it is not the role of the courts to balance the equities between the parties.  The NVRA is "designed to implement important public policies" and the case at bar is "one of those comparatively rare cases in which, unless the plaintiffs receive *now* whatever relief they are entitled to, there is a danger that it will be of little or no value to them . . . when finally obtained." *Lathan*, 455 F.2d at 1116-1117 (emphasis in original).

Here, violations of the NVRA not only have occurred, but absent injunctive relief, undoubtedly will continue with future transactions at Department of Health and Human Services offices. *See supra* at 9 and accompanying declarations.  Moreover, Congress has already balanced the equities and has determined, as a matter of public policy, that violations of the statute be remedied and/or prevented by injunctive relief. *See* 42 U.S.C. § 1973gg-9(b)(2) (private action for declaratory or injunctive relief with respect to the violation).  Courts have granted injunctive relief and entered orders requiring compliance in numerous cases involving violations of the NVRA, including violations of Section 7. *Charles H.*

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

1   *Wesley Educ. Found, Inc. v. Cox,* 408 F.3d 1349 (11th Cir. 2005); *ACORN v. Miller,* 912 F.

2   Supp. 989 (W.D. Mich. 1996) (ordering prompt compliance with NVRA requirements), *aff'd,*

3   129 F.3d 833 (6th Cir. 1997); *ACORN v. Scott*, 2008 WL 2787931 (W.D. Mo. 2008) (entering

4   injunction requiring pre-election remedial plan to correct violations of Section 7 of NVRA);

5   *Project Vote v. Blackwell,* 455 F. Supp. 2d 694 (N.D. Ohio 2006); *NCSD Educ. & Legal Def.*

6   *Fund v. Scales,* 150 F. Supp. 2d 845 (D.Md. 2001) (determining injunctive relief an

7   appropriate remedy); *Wilson v. United States*, 878 F. Supp. 1324 (N.D. Cal. 1995).

8   Defendants' violations of the NVRA are not merely technical; rather, the failure to provide

9   those who conduct covered transactions with the Department of Health and Human Services

10   the opportunity to register to vote violates the very purpose of the NVRA.   Therefore, the

11   Court should issue a preliminary injunction to begin remedying past -- and preclude -- future

12   violations of the statute. *See Lathan,* 455 F.2d at 1116.

13        **II.  PLAINTIFFS SATISFY THE TRADITIONAL BALANCING TEST**

14          Because Congress expressly provided for injunctive relief, this Court need not use the

15   traditional balancing test to determine whether Plaintiffs are entitled to a preliminary

16   injunction.  Nonetheless, Plaintiffs do satisfy the requirements of the traditional balancing

17   test.

18            **1.  Plaintiffs Are Likely To Succeed on the Merits**

19
20               i.  The Evidence Submitted by Plaintiffs of Nevada's On-Going Violations of the Requirements of Section 7 Clearly Demonstrates that Plaintiffs are Likely to Succeed on the Merits.

21

22          Plaintiffs have clearly demonstrated that they have a substantial likelihood of success

23   on the merits.   In addition to Nevada's own statistical data, Plaintiffs have submitted

24   declarations from individuals who have entered public assistance agencies and engaged in

25   transactions covered by the NVRA (such as applying for or renewing an application for food

26   stamps) that triggered Section 7's requirement that DHHS employees provide the declarants

27   with voter registration forms and assistance in filling out the forms.  (*See* accompanying

28

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

1    declarations).  Each declarant states that at no time did anyone at the public assistance agency

2    offer the opportunity to register to vote.  *Id.*  These declarations demonstrate that the

3    miniscule number of VRA registrations submitted by public assistance agencies is due to the

4    Defendants' consistent failure to comply with Section 7.

5        In addition, Plaintiffs have submitted the declaration of Sabrina Khan, who visited

6    various DHHS offices and interviewed individuals who had engaged in covered transactions

7    there.  *See* Ex. A, Khan Decl.  As described in her declaration, 54% (29 of a total of 53) of the

8    people with whom Ms. Khan spoke had not been offered the opportunity to register to vote

9    while conducting business at the public assistance office, despite having conducted business

10   that triggered Section 7 requirements. *See* Ex. A, Khan Dec., ¶¶ 5(b), 6(b), 7(b), 8(b), 8(c),

11   11(b), 12(b), & 13(b).  The events described in the declarations constitute clear evidence of

12   Defendants' consistent, ongoing failure to fulfill their federally mandated obligations under

13   Section 7 of the NVRA.  Plaintiffs have demonstrated Defendants' widespread and repeated

14   violation of the NVRA and the injuries Defendants' failures have inflicted upon Plaintiffs –

15   namely, the members of the Plaintiff organizations have not been given the opportunity to

16   register to vote that the NVRA mandates they receive, and as a result they remain

17   unregistered.  Plaintiffs must also spend their precious funds on voter registration efforts that

18   should have already been undertaken by the public assistance offices.

19              ii.    Plaintiffs Are Likely to Succeed on the Merits Because
20                     Nevada's Current Policies Violate Section 7 as a Matter of Law.

21       In addition to the facts described herein related to the actual practices observed at

22   public assistance agencies in Nevada, the Plaintiffs are likely to succeed on merits of their

23   claim because Nevada's own admitted policy regarding when to distribute voter registration

24   applications violates the requirements of Section 7 as a matter of law. Section 7's plain

25   language requires that voter registration forms must be distributed to clients unless a client

26   declines *in writing* and Nevada's current policies and practices do not comply with this

27   requirement.

28                                           -13-

Section 7 requires that during each covered transaction, the agency:

A.   Distribute [a voter registration form] with each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance . . . unless the applicant, **in writing**, declines to register to vote;

B.   Provide a form [referred to as a "voter preference form"] that includes -

    I.   The question [referred to as a "voter preference question"], "If you are not registered to vote where you live now, would you like to apply to register to vote here today?"

    II.   If the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

    III.   Boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type) "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME."

    IV.   The statement, "If you would like help in filling out the voter registration application form, we will help you.  The decision whether to seek or accept help is yours.  You may fill out the application form in private."; and

    V.   The statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _____ .", the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed; and

C.   Provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.

42 U.S.C.A. § 1973gg-5(6)(emphasis added). Thus, with each covered transaction, public

assistance agencies are required with each covered transaction to provide a voter preference

form that asks whether the client wishes to register and informs the client of certain specified

information.  If the client declines *in writing* - such as by checking the "no" box on the voter

preference form - then nothing further is required.  If the client does not check either box, then

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

1 | the agency must provide the client with a voter registration application. If the client checks
2 | the "yes" box, then the agency must provide a voter registration application and assistance in
3 | completing it, unless the client declines the assistance. In short, clients must affirmatively
4 | "opt out" of receiving a voter registration application *in writing*; the provision of the
5 | application is not contingent upon an affirmative request, either written or verbal, from the
6 | client. [5]

7 | The 10th Circuit's decision in *Valdez v. Squier*, 676 F.3d 935 (10th Cir. 2012),
8 | specifically holds that the NVRA requires states to provide voter registration applications to
9 | individuals who leave the voter preference question blank. As the Tenth Circuit explained,
10 | "[i]f an applicant is passive, i.e., does not check either the "YES" or "NO" box on the
11 | declination form and thereby indicate his or her intent in writing, [a public assistance office]
12 | must, in accordance with the mandate of subsection (A), still provide him or her with a voter
13 | registration form . . . ." *Valdez v. Squier*, 676 F.3d 935, 947 (10th Cir. 2012)*; see also Nat'l*
14 | *Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Scales*, 150 F. Supp. 2d 845,
15 | 853-54 (D. Md. 2001) (rejecting the claim that persons protected by Section 7 of the NVRA
16 | may be required to affirmatively request a voter registration application in order for it to be
17 | provided). Similarly, while not reaching the issue directly, the U.S. District Court for the
18 | Northern District of Georgia stated that if the state interprets a blank response as a no and
19 | does not offer a voter registration application, that "likely runs afoul of Section 7." *Georgia*
20 | *NAACP v. Kemp*, 2012 U.S. Dist. LEXIS 14326 (N.D. Ga. Jan. 30, 2012).

21 | The evidence demonstrates that Nevada's written policies run afoul of this
22 | requirement. In addressing the voter preference question, Section A-146(7) of the Nevada
23 | TANF and SNAP Application Processing policy states that, "If there is no response on the

24 |

25 | _____
26 | [5] The phrase "in writing," should be given its ordinary meaning. *Perrin v. United States*, 444 U.S. 37, 42 (1979)
("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as
taking their ordinary, contemporary, common meaning."); *Hamilton v. United Healthcare of Louisiana, Inc.*, 310
27 | F.3d 385, 391 (5th Cir. 2002) ("A fundamental canon of statutory construction instructs that in the absence of a
statutory definition, we give terms their ordinary meaning."). *Black's Law Dictionary* defines "writing" as "any
intentional recording of words that may be viewed or heard with or without mechanical aids." *Black's Law*
*Dictionary* at 1748 (9th ed. 2009).

28 |

1  form, it is treated as a declination." *See* Ex. E, "Nevada DWSS TANF and SNAP Application

2  Processing Policy." This runs contrary to both the plain language of the NVRA and the

3  interpretation it has been given by all courts addressing the issue. As such, Plaintiffs have

4  clearly demonstrated a likelihood of success on the merits of their claims.

### 2.   Plaintiffs Are Likely To Suffer Irreparable Harm Absent Injunctive Relief

7  The Supreme Court has long held that voting is among the most fundamental rights

8  granted to United States citizens. "No right is more precious in a free country than that of

9  having a voice in the election of those who make the laws under which, as good citizens, we

10  must live. Other rights, even the most basic, are illusory if the right to vote is undermined."

11  *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964); *see Reynolds v. Sims,* 377 U.S. 533, 562, 565

12  (1964). As such, the interference with the right to vote constitutes irreparable harm. *United*

13  *States v. Berks Cnty., Pa.,* 277 F. Supp. 2d 570, 582 (E.D. Pa. 2003); *Coleman v. Bd. of Educ.*

14  *of the City of Mount Vernon,* 990 F. Supp. 221, 226 (S.D.N.Y. 1997) ("The deprivation or

15  dilution of voting rights constitutes irreparable harm."); *Puerto Rican Legal Def. and Educ.*

16  *Fund v. City of New York,* 769 F. Supp. 74, 79 (E.D.N.Y. 1991) ("it is well-settled that the

17  claimed deprivation of a constitutional right such as the right to a meaningful vote or to the

18  full and effective participation in the political process is in and of itself irreparable harm.");

19  *Dillard v. Crenshaw Cnty,* 640 F. Supp. 1347, 1363 (M.D. Ala. 1986); *Harris v. Graddick,*

20  593 F. Supp. 128, 135 (M.D. Ala. 1984).

21  Congress echoed this sentiment in the language of the NVRA: "The Congress finds

22  that— (1) the right of citizens of the United States to vote is a fundamental right; (2) it is the

23  *duty* of the Federal, State, and local governments to *promote* the exercise of that right . . . ."

24  42 U.S.C. § 1973gg(a)(1)-(2) (emphasis added). The purpose of the NVRA was to remove

25  barriers to voter registration, and therefore to voting itself. Section 7 of the NVRA makes it

26  easier for low-income citizens and those with disabilities to become registered to vote. The

27  repeated and continuing failure by Defendants to abide by the requirements of Section 7

28

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

1    causes irreparable harm to Plaintiffs and to low-income Nevada citizens, who, because of

2    Defendants' violations of federal law, face an additional burden on their right to vote – a

3    burden the NVRA was specifically intended to remove.

4         The denial of the fundamental right to vote cannot be compensated by an action at law

5    for money damages.  Further, any remedy that requires delay until the likely conclusion of

6    this litigation will be inadequate.  Such a delay will deprive hundreds of thousands of Nevada

7    citizens of the registration opportunities to which they are entitled under Section 7, and will

8    certainly result in many of them not being registered to vote in the November 2012 election.

9    This is especially the case because many beneficiaries of the programs implicated by Section

10   7, such as SNAP, recertify for their benefit programs only once every six months.[6]

11        Every election is uniquely historic and uniquely important.[7]  The inability to

12   participate in an election cannot be compensated after the fact, or assuaged by the ability to

13   participate in the next.  Without the preliminary injunctive relief Plaintiffs seek, therefore,

14   irreparable harm will be the inevitable result.

15        The Declarants interviewed are recipients of public assistance benefits who are not

16   registered to vote, or are not registered at their current address.  *See* Ex. B, Confer Decl., ¶ 4;

17   Ex. D, Phillips Decl., ¶4; Ex. C, Hulbert Decl., ¶4.  These individuals should be offered the

18   opportunity to register to vote each time they apply or recertify for public assistance benefits.

19   It is clear, however, that Defendants have failed to follow the NVRA's requirements under

20   Section 7.  As a result, individuals who receive public benefits, including members of the

21   Plaintiff organizations, are not being offered the opportunity to register when they apply or

22   recertify for benefits.  The specific purpose of Section 7 of the NVRA is to provide the

23

24

25   _____

     [6]    *See* Division of Welfare & Supportive Services, Application Processing, ELIGIBILITY AND
26   PAYMENTS MANUAL § 162 (2011), *available at* https://dwss.nv.gov/dmdocuments/EP_Man_A-0100.pdf.
     [7]    Plaintiffs note that the upcoming November elections may be of particular interest to Nevada citizens.
27   According to the Secretary of State's website, more than 970,000 Nevada residents voted in the 2008
     presidential election.  This number represented more than 80% of the more than 1.2 million registered voters in
28   Nevada, and was more than a 16.5% increase in the number of voters in the 2004 election.  *See*
     http://nvsos.gov/index.aspx?page=93.  However, analysis of data collected by the U.S. Census indicates that in

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

opportunity to register to vote through voter registration agencies to make registering more convenient for recipients of public assistance benefits, including Declarants and members of the Plaintiff organizations, just as the NVRA makes it more convenient to vote for those who visit motor vehicle bureaus.   Despite Section 7, however, that hardship remains, due to Defendants' failure to follow the requirements of the NVRA.   Members of the Plaintiff organizations who are not registered to vote, and who have not been offered the opportunity to register to vote when they applied for or recertified public assistance benefits or reported changes of addresses, as well as those who are not registered to vote and have yet to apply for or recertify public assistance benefits or report changes of addresses but who will do so in the future, will remain unable to exercise their fundamental right to vote, and will therefore suffer irreparable harm absent injunctive relief.

In addition, the Plaintiffs continue to suffer harm in their own rights as a result of Defendants' failure to adhere to Section 7. Due to Defendants' failure, Plaintiffs must devote their own resources to voter registration assistance efforts for their members and other low-income members of the community. *See Fla. State of Conference of NAACP v. Browning*, No. 07-15932, 2008 U.S. App. LEXIS 7100, *34-36 (11th Cir. Apr. 3, 2008) (organizations alleging violation of Help America Vote Act established standing based on proof that responding to Florida third-party registration law diverted resources from voter registration drives and election day monitoring); *Ga. State Conference of N.A.A.C.P. v. Kemp*, 2012 WL 265925 (N.D. Ga. Jan. 30, 2012) (organization was sufficiently injured by expending time and resources to register voters who should have been offered registration through public assistance agencies).   As such, the continuing failure of the DHHS offices to offer voter

---

Nevada close to 140,000 adult citizens in households making less than $25,000 annually were not registered to vote in 2010. *See* November 2010 Current Population Survey, DataFerrett, at http://dataferrett.census.gov

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

registration opportunities as required by the NVRA has required the Plaintiffs to expend resources they would not otherwise have expended, thereby diverting resources the Plaintiffs need for community organization, issues campaigns, and other programs in order to realize full achievement of their goals.  Defendants' failure to abide by the requirements of the NVRA, therefore, has hampered and impeded Plaintiffs' missions, and continues to cause Plaintiffs irreparable harm.

### 3.         The Balance Of Equities Favors Injunctive Relief

As demonstrated above, if the Court does not grant preliminary injunctive relief, the Plaintiffs and their members will suffer significant irreparable harm, namely, deprivation of the opportunity to register to vote as contemplated by Congress when it passed the NVRA.  If an injunction is not granted, hundreds of thousands of low-income Nevadans will lose the opportunity to register, and therefore to vote, in the upcoming November elections.   In addition, Plaintiffs will be forced to spend a significant portion of their limited time and resources assisting low-income voters with registering to vote, expenditures that would be unnecessary were Defendants complying with their obligations under the NVRA.

In contrast, to the extent the Defendants suffer any burden if the injunction is granted, it is a burden – compliance with the NVRA -- that has been mandated by Congress, and must be accepted.  *See, e.g.*, *Charles H. Wesley Educ. Found,* 324 F. Supp. 2d at 1368 (NVRA required acceptance of bundled mail-in voter registrations), *aff'd,* 408 F.3d 1349 (11th Cir. 2005).  In any event, any expense incurred by Defendants in complying with the NVRA is greatly outweighed by the fundamental rights of Nevada citizens that an injunction would protect.  *See Berks Cnty.,* 277 F. Supp. 2d at 582 ("Defendants will not suffer irreparable harm if a permanent injunction is issued.  Any small additional monetary expense to Defendants to conduct the election in compliance with the Voting Rights Act is far outweighed by the important fundamental right involved in this case.").   The balance of potential harms thus clearly weighs in favor of issuing a preliminary injunction.

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

### 4.    An Injunction Is In The Public Interest

Courts must consider the public interest in any injunctive action in which public interest is affected, *Am. Motorcyclist Ass'n. v. Watt*, 714 F.2d. 962, 967 (9th Cir. 1983) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S. Ct. 1798, 1803, 72 L. Ed. 2d 91 (1982), and it must be given substantial weight. *See Yakus v. United States*, 321 U.S. 414 (1944); *Inland Steel Co. v. United States*, 306 U.S. 153 (1939). Here, it is clear that the public interest favors granting Plaintiffs' motion for a preliminary injunction. The voting rights of hundreds of thousands of Nevada citizens are at stake. The language of the NVRA itself makes clear where Congress stands on the question of public interest: "The Congress finds that— (1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right . . . ." 42 U.S.C. § 1973gg(a)(1)-(2). The public interest is best served by an injunction that ensures that Nevada "stays true to the avowed *national* interests embodied within the National Voter Registration Act of 1993." *Project Vote*, 455 F. Supp. 2d at 708 (emphasis in original).

The injunctive relief Plaintiffs seek requires only that Nevada and its public assistance agencies comply with Section 7 to prevent future harm and remediate clear past violations of the NVRA. In comparison to the paramount importance of the right to vote, the additional expenditure of money or resources an injunction would require would be insubstantial. Therefore, any opposition to the injunctive relief sought here would not be in the public interest. It is clear, then, that the significant public interests involved in this case weigh entirely in favor of granting an injunction.

### III.    Plaintiffs Have Also Satisfied The "Alternative" Test

As discussed above, because Congress has expressly authorized injunctive relief for violations of the NVRA, Plaintiffs do not have to prove that they satisfy the "alternative" test. Nonetheless, in an abundance of caution, Plaintiffs do so here.

The factors analyzed under the "alternative" test are similar to those under the "traditional" test, but are weighted in a different manner. Under the "alternative 'sliding-

-20-

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

1    scale' test" for analyzing a motion for preliminary injunction, the moving party must

2    demonstrate "either a combination of probable success on the merits and the possibility of

3    irreparable injury or that serious questions are raised and the balance of hardships tips sharply

4    in his favor." *Greater Yellowstone Coalition v. Timchak*, 2009 WL 971474, at *1. Under this

5    test, "the less certain the district court is of the likelihood of success on the merits, the more

6    plaintiffs must convince the district court that the public interest and balance of hardships tip

7    in their favor." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir.

8    2003); *see also Burlington N. R.R. Co. v. Dept. of Rev. of State of Wash.*, 934 F.2d 1064, 1074

9    n.6 (9th Cir. 1991) ("These two [alternative test] formulations represent two points on a

10   sliding scale in which the required degree of irreparable harm increases as the probability of

11   success decreases.").

12          As detailed above, Plaintiffs have established a strong likelihood of success on the

13   merits and irreparable harm, as both the attached declarations and the statistical data from

14   Nevada indicate that Nevada is not in compliance with Section 7 of the NVRA and, absent

15   preliminary injunctive relief, hundreds of thousands of Nevada residents will be deprived of

16   voter registration rights. Moreover, Plaintiffs have demonstrated that the balance of hardships

17   tips sharply in favor of injunctive relief, which will: 1) allow Nevada citizens the opportunity

18   to register, and therefore vote, in the upcoming presidential election; 2) relieve Plaintiffs of

19   the need to spend further time and resources assisting low-income voters with registering to

20   vote; and 3) impose no burden on the Defendants aside from compelling them to comply with

21   the mandates of the United States government.

22          Thus, even if a balancing of the equities was required here -- which it is not --

23   Plaintiffs have unequivocally established each of the factors necessary under either the

24   traditional or the alternative tests applied in this Circuit.

25   ///

26   ///

27   ///

28

WOODBURN AND WEDGE
6100 Neil Road, Ste. 500
Reno, Nevada 89511
Tel: (775) 688-3000

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court grant their Motion for a Preliminary Injunction.

DATED this **6** day of July, 2012.

WOODBURN AND WEDGE

By: _____

W. Chris Wicker (Bar # 1037)
6100 Neil Road, Suite 500
Reno, NV 89511
(775) 688-3000
cwicker@woodburnandwege.com

Neil Steiner*
neil.steiner@dechert.com
Jamie Halavais*
jamie.halavais@dechert.com
Dechert LLP

David Rubino*
Dēmos
drubino@demos.org

Robert A. Kengle*
bkengle@lawyerscommittee.org
Alan Martinson*
amartinson@lawyerscommittee.org
Lawyers' Committee for Civil Rights
Under Law

Sarah Brannon*
sbrannon@projectvote.org
Michelle Rupp*
mrupp@projectvote.org

Kim Keenan*
kkeenan@naacpnet.org
Anson Asaka*
aasaka@naacpnet.org
National Association for the Advancement of
Colored People, Inc.

*pro hac vice admission to be sought, will
comply with LR IA 10-2 within 45 days

-22-

1
2

## **CERTIFICATE OF SERVICE**

3        I hereby certify that I am an employee of Woodburn and Wedge and that on this date,

4   I caused to be sent via electronic mail, a true and correct copy of the MEMORANDUM OF

5   LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

6   to:

7        Kevin Benson
         OFFICE OF THE NEVADA ATTORNEY GENERAL
8        100 North Carson Street
         Carson City, Nevada 89701-4717
9        *kbenson@ag.nv.gov*

10       DATED this ⟶ day of July, 2012.

11

12                                              By:  *[signature]*
13                                                   Kelly N. Weaver

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBITS TO MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

Exhibit A:   Declaration of Sabrina Khan, dated July 6, 2012, 6 pages
Exhibit B:   Declaration of Sheila Confer, dated July 6, 2012, 2 pages
Exhibit C:   Declaration of Kendra Hulbert, dated July 6, 2012, 2 pages
Exhibit D:   Declaration of Denisha Phillips, dated July 6, 2012, 2 pages
Exhibit E:   Nevada DWSS TANF and SNAP Application Processing Policy, 37 pages