1  CATHERINE CORTEZ MASTO
   Attorney General
2  KEVIN BENSON
   Senior Deputy Attorney General
3  Nevada Bar No. 9970
   Attorney General's Office
4  100 North Carson Street
   Carson City, Nevada 89701-4717
5  (775) 684-1114
   Attorneys for Ross Miller, Secretary
6  of State and Michael J. Willden, Director
   of the Department of Health and Human
7  Services

8           IN THE UNITED STATES DISTRICT COURT

9                  DISTRICT OF NEVADA

10

11  NATIONAL COUNCIL OF LA RAZA, LAS        )  CASE NO.   3:12-cv-00316-RCJ-VPC
    VEGAS BRANCH OF THE NAACP              )
12  (BRANCH 1111), and RENO-SPARKS          )  **DEFENDANTS' OPPOSITION TO MOTION**
    BRANCH OF THE NAACP (BRANCH 1112),      )  **FOR PRELIMINARY INJUNCTION**
13                                          )
             Plaintiffs,                    )
14                                          )
                                            )
15  vs.                                     )
                                            )
16  ROSS MILLER, in his official capacity as )
    Secretary of State of the State of Nevada; and )
17  MICHAEL WILLDEN, in his official capacity )
    as Director of the Department of Health &  )
18  Human Services of the State of Nevada.    )
                                            )
19           Defendants.                     )
                                            )
20  _____ )

21        Defendants Ross Miller, Secretary of State, and Michael Willden, Director of the Department of

22  Health & Human Services, by and through counsel, Catherine Cortez Masto, Attorney General, and

23  Kevin Benson, Senior Deputy Attorney General, hereby opposes Plaintiffs' Motion for Preliminary

24  Injunction (#24 and #25)[1].

25  ////

26  ////

27

28

[1] These numbers refer to this Court's docket numbers. Docket #24 is styled as the Motion for Preliminary Injunction, and Docket #25 is a memorandum of points and authorities in support of the Motion (#24). Unless otherwise noted, as used in this opposition the term "Motion" refers to documents #24 and #25 collectively, and "Memo." refers to document #25.

1

1    ## MEMORANDUM OF POINTS AND AUTHORITIES

2    ### I.   Preliminary Injunction Standard

3    "A preliminary injunction is 'an extraordinary and drastic remedy. one that should not be

4    granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680

5    F.3d 1068. 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968. 972 (1997)). This

6    burden requires the plaintiff to show: "1) he is likely to succeed on the merits of such a claim; 2) he is

7    likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in

8    his favor: and 4) that an injunction is in the public interest." *Id.* (citing *Winter v. Natural Res. Def.*

9    *Council, Inc.*, 555 U.S. 7, 20 (2008)).

10   All four of the *Winter* factors must be met. *Alliance for the Wild Rockies v. Cottrell*. 632 F.3d

11   1127, 1132 (9th Cir. 2011). However, these factors may be balanced against each other, so that a

12   stronger showing on one factor may offset a weaker showing on another. *Id.* at 1131-32. Thus, under

13   the "serious question" formulation of the standard. the plaintiff who cannot show a *likelihood* of

14   success on the merits must still raise "serious questions" as to the merits, while *also* showing that the

15   balance of the hardships tips *sharply* in his favor. *Id.* at 1134-35.

16   Of course, the other two *Winter* factors must also be met. *Id.* at 1135. These are: that the

17   plaintiff is *likely* to suffer irreparable harm, not just that there is a mere possibility; and, that the

18   injunction is in the public interest. *Id.* "A preliminary injunction is an extraordinary remedy never

19   awarded as of right." *Winter*, 555 U.S. at 24.

20   ### II.  Availability of Injunctive Relief Under the NVRA Does Not Relieve Plaintiffs of Meeting
21   all Four *Winter* Factors.

        Plaintiffs argue that. because the NVRA allows for declaratory and injunctive relief, they are
22
     relieved of having to meet the normal four-part *Winter* test for issuance of a preliminary injunction. *See*
23
     Memo.. pp. 11-12. This is not the case because the NVRA does not limit courts' equity jurisdiction by
24
     mandating that courts enter a preliminary injunction whenever a violation has occurred or is threatened.
25
     No case law supports this reading of the NVRA. nor does the statute itself.
26
        Congress may alter the traditional equitable balancing test. *Tennessee Valley Authority v. Hill*,
27
     437 U.S. 153 (1978). However, courts "do not lightly assume that Congress has intended to depart from

28   established principles [of equitable discretion]." *Owner Operator Independent Drivers Ass'n, Inc. v.*

1   *Swift Transp. Co., Inc.*. 367 F.3d 1108, 1112 (9th Cir. 2004) (quoting *Weinberger v. Romero-Barcelo*.

2   456 U.S. 305, 313 (1982)). "Therefore. unless a statute in so many words, or by a necessary and

3   inescapable inference, restricts the court's jurisdiction in equity. the full scope of that jurisdiction is to

4   be recognized and applied." *Id.* (internal quotations omitted).

5        "The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty

6   to do so under any and all circumstances. and a federal judge sitting as chancellor is not mechanically

7   obligated to grant an injunction for every violation of law." *Weinberger*, 456 U.S. at 313. Accordingly,

8   just because a statute permits an injunction as one form of remedy. this is not sufficient to find that

9   Congress intended to constrain the equity jurisdiction of courts to balance the traditional preliminary

10  injunction factors. *Swift Transp.*, 367 F.3d at 1115.

11       For these reasons, the Ninth Circuit in *Swift Transportation* affirmed the district court's use of

12  the traditional preliminary injunction factors, even though the statute in question provided: "A person

13  injured because a carrier [violates the Truth–in–Leasing regulations] may bring a civil action to

14  enforce[the regulations]. *A person may bring a civil action for injunctive relief for violations [thereof].*"

15  *Id.* at 1114 (alterations and emphasis in original). The court reasoned:

16            While this language clearly authorizes injunctive relief, it plainly does
              not, "in so many words, or by a necessary and inescapable inference,"
17            require an injunction to issue to prevent violations of the Truth–in–
              Leasing regulations irrespective of traditional equitable considerations.
18

19  *Id.*

20       Similarly. the NVRA provides in relevant part: "the aggrieved person may bring a civil action in

21  an appropriate district court for declaratory or injunctive relief with respect to the violation." 42 U.S.C.

22  § 1973gg-9(b)(2). Just like in *Swift Transportation*. there is nothing in this section of the NVRA that

23  requires an injunction to issue irrespective of traditional equitable considerations.

24       Furthermore, if the alleged violation of the NVRA occurs more than 30 days before an election,

25  the aggrieved person must first give notice to the chief elections officer. and allow either 20 or 90 days

26  for the violation to be cured. 42 U.S.C. § 1973gg-9(b). A plaintiff who fails to give proper notice and

27  allow the statutory opportunity to cure the violation lacks standing to bring suit. *Georgia State*

28  *Conference of N.A.A.C.P. v. Kemp*, ___ F.Supp.2d ___, 2012 WL 265925 at *12 (N.D.Ga. 2012).

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

3

1    These notice-and-cure provisions are inconsistent with the notion that Congress intended the

2    courts to automatically issue injunctions whenever a violation or threatened violation of the NVRA is

3    shown.  Instead, it is apparent that Congress intended to give states an opportunity to fix any alleged

4    violations before facing litigation at all. But even should they fail to cure the violation within the

5    statutory time frame, the statute does not require the court to abandon the traditional preliminary

6    injunction test, because nothing in the statute clearly says as much, nor is that the necessary implication

7    of the NVRA. "The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute

8    duty to do so under any and all circumstances." *Weinberger*, 456 U.S. at 313.

9    Plaintiffs primarily rely on *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860 (9th Cir.

10   1983). That case involved the Railroad Revitalization and Regulatory Reform Act of 1976, which

11   prohibited "taxation of rail-transportation property at a rate higher than the rate generally applicable to

12   commercial and industrial property in the same assessment jurisdiction." *Id.* at 862-63. The appellants

13   argued that the district court erred in entering a preliminary injunction without requiring plaintiffs to

14   meet the usual standards. *Id.* at 868-69. The court rejected this argument, explaining: "The standard

15   requirements for equitable relief need not be satisfied when an injunction is sought to prevent the

16   violation of a federal statute which specifically provides for injunctive relief." *Id.* at 869. Seizing upon

17   this statement, Plaintiffs attempt to apply it to the NVRA, where it is not applicable because of the

18   differences in the statutory language.

19   In *Trailer Train*, the relevant part of the statute provided: "a district court of the United States

20   has jurisdiction ... to grant such mandatory or prohibitive injunctive relief, interim equitable relief, and

21   declaratory judgments as may be necessary to prevent ... any acts in violation of this section." *to*

22   *prevent* ... any acts in violation of this section." *Id.* at 869 n. 16 (emphasis added). The court found that

23   the Railroad Act is an exception because the section in question "specifically authorizes a district court

24   to grant injunctive relief *to prevent* a violation of the statute." *Id.* (emphasis added).

25   Here, by contrast, there is no such language in the NVRA. This case is indistinguishable from

26   *Swift Transportation*, a more recent case where the court held that even though the statute allows

27   injunctive relief as a remedy that does not mean Congress intended to abrogate the traditional

28   preliminary injunction test. 367 F.3d at 1114-15.

1    Finally, the other NVRA cases Plaintiffs cite to do not support their argument that they need not

2    meet the traditional preliminary injunction standard. *See* Memo., p. 11, ll. 26-28. In fact, these cases

3    support the application of the traditional preliminary injunction standards. In each of the following

4    cases cited by Plaintiffs, the courts used the four traditional *Winter* factors in deciding on the

5    preliminary injunction: *Charles H. Wesley Educ. Foundation, Inc. v. Cox*, 408 F.3d 1349, 1354-1356

6    (5th Cir. 2005); *Association of Community Organizations for Reform Now v. Scott*, Not Reported in

7    F.Supp.2d, 2008 WL 2787931 at * 7 (W.D.Mo. 2008); *Project Vote v. Blackwell*, 455 F.Supp.2d 694,

8    702-09 (N.D.Ohio 2006). Although the analysis is very brief, it appears the court in *Wilson v. U.S.*, 878

9    F.Supp. 1324, 1328 (N.D.Cal. 1995) also applied the traditional preliminary injunction standard.

10    The remaining two cases relied on by Plaintiffs do not support their argument. In *Association of*

11    *Community Organizations for Reform Now v. Miller*, 912 F.Supp. 989 (W.D.Mich. 1996) a preliminary

12    injunction was actually not at issue; instead, the defendants had lost on summary judgment (*see* 912

13    F.Supp. 976, 988), and the issue was a request for an additional 6 month extension to comply with the

14    NVRA. In, In *National Coalition for Students with Disabilities v. Scales*, 150 F.Supp.2d 845, 856

15    (D.Md. 2001), the court did not grant a preliminary injunction; it only denied in part the defendants'

16    motion to dismiss.

17    Thus none of the cases Plaintiffs cite stand for the proposition that the NVRA relieves them of

18    having to show all four *Winter* factors in order to obtain a preliminary injunction. In fact, the cases that

19    involve preliminary injunction all apply the traditional four-part test. Accordingly, Plaintiffs in this case

20    are likewise required to satisfy the traditional test in order to obtain a preliminary injunction.

21    **III.    Plaintiffs have not shown either serious questions or a likelihood of success on the merits.**

22    The facts discussed in Plaintiffs' Motion do not show that Nevada is not complying with the

23    National Voter Registration Act ("NVRA"), nor do they show that a preliminary injunction should

24    issue.

25    1.    The Census Bureau data does not show that any registration gap between poor and
      wealthy households are caused by noncompliance with Section 7 of the NVRA.

26

27    Plaintiffs rely on statistics from the U.S. Census Bureau. *See* Memo., p. 5, ll. 6-12. According to

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717
28    Plaintiffs, this data shows that only 47.6% of eligible Nevada citizens who live in households earning

1  $25,000 a year or less are registered to vote, compared with 72.4% of eligible citizens living in a

2  household earning $100,000 a year or more. However, these statistics do not indicate that Nevada is not

3  complying with the NVRA. First, the data is from 2010 and earlier. Memo., p. 5, ll. 7-8. Thus the data

4  is old and does not indicate anything about Nevada's present state of affairs.

5  Second, the mere fact that a lower percentage of people living in low-income households are

6  registered to vote than the percentage of people living in high-income households does not demonstrate

7  – or even suggest – any causal link between this fact and any alleged non-compliance with the NVRA

8  by Defendants. There are a great number of reasons that could influence this gap in registration, other

9  than violations of the NVRA: education, social status, community involvement, etc.

10  The figures Plaintiffs rely on for Nevada is similar to the "voter registration gap" that exists

11  nationally. For 2010, Census Bureau data show that for households earning $20,000 or less, the percent

12  registered is 58.1%, and for households earning more than $100,000 is 79.9%. a "voter registration

13  gap" of 21.8%. Thus there is less than a 3% difference between Nevada and the national average. *See*

14  Table 7, Reported Voting and Registration of Family Members, by Age and Family Income: November

15  2010, attached hereto as "Exhibit 1," (available at

16  http://www.census.gov/hhes/www/socdemo/voting/publications/p20/2010/tables.html).

2.    <u>The EAC data for Nevada is incomplete and contains an obviously incorrect</u>
<u>outlier, and therefore is not reliable.</u>

19  Nor does the data from the Elections Assistance Committee show any violation of the NVRA.

20  Like the Census Bureau data, the most recent data is at least two years old. But more importantly, the

21  data is incomplete and contains an obvious error. Therefore it cannot be used to make any rational

22  inference that Nevada is violating the NVRA.

23  First, the data for the EAC reports is incomplete. For example, the most recent data from 2009-

24  2010 contains data from only nine counties. "The Impact of the National Voter Registration Act of

25  1993 on the Administration of Elections for Federal Office 2009-2010," (hereinafter "Impact 2009-

26  2010") p. 39. Table 2a, a copy of which is attached hereto as "Exhibit 2" As explained on page 4 of the

27  report, footnote 12, the "cases" column of this report states the number of jurisdictions within the state

28  that have reported data of zero or greater. That note also explains that, although the options of "data not

available" and "not applicable" are available, some jurisdictions nevertheless report zero when they should use one of those categories. *Id.* at p. 4, n. 12.

Similarly, the data from 2007-2008 shows only eight counties reported. "The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2009-2010," (hereinafter "Impact 2007-2008") p. 39, Table 2a, a copy of which is attached hereto as "Exhibit 3." Furthermore, the notes to that table state that one county listed all registrations as mail-in registrations, one reported only for 2008, and another stated the numbers were approximations. *Id.* at p. 41.

For 2001-2002, the EAC statistics for Nevada states that there were 39,444 applications from public assistance agencies. "The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2001-2002," (hereinafter "Impact 2001-2002") p. 45, Table 2, a copy of which is attached hereto as "Exhibit 4." However, the report notes that Eureka County did not report any data and that "Due to software problems, thirteen jurisdictions were unable to report the numbers of new valid registrations, the number of responses received by mail and the number of registrants deleted from the list." Table 4 of Impact 2001-2002, a copy of which is attached hereto as "Exhibit 5."

As stated in the Plaintiffs' Memorandum, the number of voter applications received from public assistance agencies in Nevada was:

| 1995-1996 | 13.200 |
| 1997-1998 | No report |
| 1999-2000 | 2,883 |
| 2001-2002 | 39,444 |
| 2003-2004 | 6,389 |
| 2005-2006 | 3,307 |
| 2007-2008 | 4,301 |
| 2009-2010 | 1.677 |

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

This table shows that the figure of 39,444 is greater, by an order of magnitude, than nearly any other number reported by Nevada. Additionally, that number represents 19.28% of all voter registrations received in that cycle – by far the highest percentage in the nation. *See* Exhibit 4. It is more than seven times the national average. Exhibit 4, p. 50. This strongly suggests that the figure of 39,444 is simply a clerical error.

Even if 39,444 were an accurate figure for the 2001-2002 election cycle, it remains such a significant outlier that it is not reasonable to assume that it is reflective solely of Nevada's compliance with the NVRA. In other words, it simply does not make sense to conclude that for the 2001-2002 election cycle, and *only* that cycle, Nevada fully implemented Section 7, but failed to do so either before or after, and this is the only cause of the difference in the numbers reported to the EAC.

Plaintiffs breathlessly claim that the data shows a "95.7 percent decline" in voter registrations through public assistance agencies, and therefore there must be a systematic failure to implement the NVRA. However, the data show nothing of the sort, because it is out of date, incomplete, and contains a single, gross outlier that cannot be reasonably used as the high water mark of Section 7 compliance.

> 3.    Plaintiffs' evidence of noncompliance with Section 7 is unreliable because it is almost entirely uncorroborated hearsay.

Plaintiffs rely heavily on the investigations of nine Division of Welfare and Supportive Services ("DWSS") or Women, Infants, and Children ("WIC") offices, conducted by Sabrina Khan in December of 2011. *See* Khan Decl., Exhibit A to Memo. These investigations consisted primarily of interviewing clients as they were leaving the offices. Khan Decl., ¶¶ 3, 5(b), 6(b), 7(b), 8(b),(c), 11(b), 12(b), 13(b),(c). Some of these clients allegedly stated that they either were never asked if they wanted to vote, never given an application, never saw a question on the form asking whether they wanted to vote, or were not given an application after asking for one. *Id.* Ms. Khan also spoke with some office staff. Khan Decl., ¶¶ 4, 5(a), 6(a), 7(a), 8(a), 9(a), 10(a), 11(a), 12(a), 13(a).

All of these statements are hearsay because they are made by out-of-court declarants. and are being offered for the truth of the matters asserted. Fed.R.Evid. 801(c). Ordinarily, hearsay is inadmissible unless permitted specifically by a federal statute, the rules of evidence, or other court rule prescribed by the U.S. Supreme Court. Fed.R.Evid. 802. Nevertheless, the Ninth Circuit has allowed

1  district courts to consider hearsay on preliminary injunction motions to prevent irreparable harm. *See*

2  *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) ("The trial court may give even

3  inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm

4  before trial.") The court reasoned: "The urgency of obtaining a preliminary injunction necessitates a

5  prompt determination and makes it difficult to obtain affidavits from persons who would be competent

6  to testify at trial." *Id.*

7        Although a district court *may* consider hearsay on a motion for preliminary injunction, it should

8  not do so in this case. There is no threatened irreparable harm, and there is no urgency that would

9  prevent obtaining non-hearsay evidence. The irreparable harm issue is discussed at length below in this

10  brief. But in short, there is no irreparable harm threatened here because there are no individual plaintiffs

11  whose right to vote is being threatened by Defendants' alleged noncompliance with the NVRA. Second,

12  the alleged harm to the Plaintiff organizations themselves is questionable factually and is monetary in

13  nature, and therefore not irreparable. Third, as discussed in the Motion to Dismiss, Plaintiffs all lack

14  standing to pursue this action because of their failure to give the statutorily required notice.

15        As to the urgency, as Ms. Khan's affidavit states, her investigations took place on December 7

16  and 8, 2011. It was not until May 10, 2012 that Plaintiffs sent notice to Defendants that they believed

17  there were violations of the NVRA. The Motion for Preliminary Injunction was not filed until July 7,

18  2012. Thus approximately eight months passed from the time of the investigations by Ms. Khan to the

19  filing of the motion. This is more than enough time for Plaintiffs to have obtained non-hearsay

20  affidavits from persons who would be competent to testify at trial. *See Flynt Distrib.*, 734 F.2d at 1394

21  (hearsay may be considered on preliminary injunction when justice requires due to the difficulty of

22  obtaining competent evidence on short notice).

23        Furthermore, Defendants would suffer substantial prejudice if this Court were to consider the

24  hearsay statements in Ms. Khan's affidavit. First, most of the declarants are not identified, so there is no

25  way for Defendants to investigate the accuracy of their statements. As will be discussed below, it is not

26  unlikely that, if Defendants were able to identify and investigate such declarants, it could well turn out

27  that their statements are not accurate. But without this opportunity, Defendants are unfairly left without

28  any way of defending themselves against these anonymous assertions. Defendants also must oppose

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

1  Plaintiffs' motion in just two weeks – far shorter than the eight months Plaintiffs had to prepare their

2  motion.

3  Second, the assertions are not supported by any corroborating admissible evidence. By contrast,

4  in *Johnson v. Couturier*, 572 F.3d 1067, 1083, n. 10 (9th Cir. 2009), the Ninth Circuit found that the

5  district court did not abuse its discretion in considering hearsay on a preliminary injunction motion,

6  because the district court's order also noted that the district court relied on other numerous affidavits

7  and declarations, including the admissions of one party which tended to support the inference from the

8  hearsay affidavits that the defendants were engaged in self-dealing. In this case, since there is no other

9  non-hearsay evidence supporting these claims, this Court should give those statements no weight at all.

10  In sum, generally hearsay is not admissible. But courts may consider it on a preliminary

11  injunction motion when justice requires doing so to prevent irreparable harm and the urgency of the

12  situation makes it difficult to obtain competent evidence. Here, the harm is questionable factually and

13  not irreparable in any event. Nor is there any urgency to this motion that would justify using hearsay,

14  because Plaintiffs waited eight months from the time of their investigations to file the motion. Finally,

15  considering the hearsay would cause significant prejudice to the Defendants. For these reasons, this

16  Court should not consider any of the hearsay statements in Ms. Khan's affidavit.

17      4.    The statements from clients in the Khan affidavit are not sufficient to show
            a violation of the NVRA.
18

19  Plaintiffs assert that they are likely to prevail on the merits because 29 of the 53 clients, or 54%,

20  to whom Ms. Khan spoke indicated that they were not offered the opportunity to register to vote when

21  they visited a public assistance agency. Memo, p. 13, ll. 5-10. Even if this Court considers these hearsay

22  statements, they do not show any violation of the NVRA, and therefore do not support issuance of a

23  preliminary injunction.

24  First, there is no requirement under the NVRA to verbally ask clients if they wish to register to

25  vote; therefore, failure to do so is not a violation of NVRA. *See* 42 U.S.C. § 1973gg-5 (requiring there

26  to be a *written* question on certain forms, but not requiring any verbal inquiries). The declaration states

27  that many of the clients asserted that they were not asked if they wanted to register to vote.

28  For example, paragraph 5(b) states that Ms. Khan interviewed 10 clients. Four stated that they

"were not asked" if they wanted to register to vote by DWSS staff. One client stated that they "did not see" a voter preference question, were not asked if they wanted to register to vote, *and* were not provided an application. Counting only those clients who only stated that they were not asked whether they wished to register to vote (as opposed to those who stated they were not asked *and* did not see a question on the form, were not provided a form, etc.), the affidavit identifies 15 clients. Khan Affidavit, ¶¶ 5(b) (four); 8(c) (one, who was ineligible in any event); 11(b) (six); 13(b) (four).

Thus, of the 29 eligible clients who allegedly were not given the opportunity to register, the statements of 15 of those clients do not support any violation of the NVRA, as a matter of law. This brings the total down to 14 clients out of 53 who allegedly were not given the opportunity to register.

Of those 14 remaining clients, twelve[2] of them indicated that they were not asked if they wanted to register, did not recall seeing a question on the form asking if they wanted to register, and did not receive a form. Khan Decl. ¶¶ 5(b) (one client); 6(b) (one); 7(b) (four); 8(b) (one); 11(b) (one); 12(b) (three); 13(b) (one). Notably, the statements from these unidentified clients all say that the client either "did not see" (*see e.g.*, ¶¶ 5(b), 6(b)), or "could not recall seeing" a voter preference question on the forms (*see e.g.*, ¶¶ 7(b), 8(b)).

Of course, just because the client did not see the question, or cannot recall seeing the question, does not mean that the question is not in fact on the forms. DWSS and WIC use standardized forms, all of which contain a question inquiring whether the client wishes to register to vote. *See* Declaration of Miki Allard, p. 1, ll. 17-19, attached hereto as "Exhibit 6;" Declaration of Michelle Walker, p. 1, ll. 21-22, attached hereto as "Exhibit 7."

Furthermore, it is not known from these clients' statements whether these clients checked "Yes" or "No" on the form, or whether they left it blank. None of them affirmatively state that they checked "Yes," or that they left the box blank. This, combined with the fact that none of them are identified, makes it impossible to investigate whether in fact they were not given a registration application, and if not, why not. It is entirely possible that they checked the "No" box. There is no evidence indicating otherwise. Thus it would be unreasonable to infer from these statements that any violation of the NVRA occurred. It certainly does not satisfy the "clear showing" required of the movant. *Lopez*, 680 F.3d at

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

28

---

[2] This number excludes one client who was ineligible. *See* Khan Declaration, ¶ 8(c).

11

1072.

Finally, only the 2 remaining clients affirmatively stated that they checked the "yes" box on the voter preference form, yet were not provided a voter registration application. Khan Decl. ¶¶ 11(b), 13(b).

Ms. Damita Williams is one of the clients who asserted that she was not provided with an application, even though she checked "yes" on the form. Khan Decl. ¶ 13(b). However, records from DWSS indicate that she left the form blank. *See* Exhibit 6, Allard Decl., p. 2, ll. 21-26. During a follow-up from her caseworker, the caseworker inquired which box Ms. Williams wanted to check, and then marked "No" at her request and initialed and dated the checkmark. *Id.*

Ms. Anna Roe also asserted that she was not provided with an application, even though she checked "yes" on the form. Khan Decl., ¶ 11(b). According to Ms. Khan's Declaration, Ms. Roe was interviewed at the DWSS office on Belrose Street on December 8, 2011. However, DWSS does not have any record of Ms. Roe submitting any paperwork to that office that day. *See* Exhibit 6, Allard Decl., p. 2, ll. 12-20. DWSS could find only two voter preference forms for Ms. Roe: one is dated July 1, 2011, and another is dated January 9, 2012. *Id.* On both forms, the "No" box is checked. *Id.*

In short, there is conflicting evidence regarding whether Ms. Williams or Ms. Roe actually checked "Yes" on the voter preference form and yet did not receive a voter registration form.

In sum, Plaintiffs' evidence does not make a "clear showing" that Defendants are not complying with the NVRA. *See Lopez*, 680 F.3d at 1072 (movant must make a "clear showing" to carry the burden of persuasion). Nor does it raise serious questions on the merits. Of the 29 clients they assert were not offered the opportunity to register, 15 of them stated they were not asked if they wished to register to vote. Since there is no requirement to verbally ask clients if they wish to register, this does not, as a matter of law, show any violation of the NVRA.

Twelve other clients only asserted that they "did not see" or "cannot recall seeing" whether there was a question on the forms asking them if they wanted to register. Yet the forms are standardized, and all contain that question. Thus, for 27 of the 29 clients who Plaintiffs allege were not given the opportunity to register, there is no evidence that remotely suggests a violation of the NVRA.

Finally, there is no evidence that corroborates the hearsay statements of the two identified

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

1  clients who stated that they checked "yes," but did not receive a form. In both cases, there is evidence

2  contradicting these assertions.

3      For these reasons, the hearsay statements of the clients who were interviewed do not show that

4  any violations of the NVRA in fact occurred, let alone show systemic noncompliance that justifies the

5  extensive injunctive relief that Plaintiffs seek in this case.

6      5.    The NVRA does not require Spanish voter registration forms in Washoe County.

7      Ms. Khan's declaration asserts that Spanish language voter registration forms were not available

8  at the DWSS office on King's Row in Reno, Nevada (¶ 6(a)), and the WIC office on 9th Street in Reno

9  (¶ 7(a)). This is not a violation of the NVRA.

10      Section 203 of the Voting Rights Act ("VRA") requires ballot materials (including voter

11  registration forms) to be made available in minority languages in certain jurisdictions where there is a

12  sufficiently large language-minority population. 42 U.S.C. § 1973aa-1a. Currently, Clark County is the

13  only jurisdiction in Nevada that is required under the VRA to provide minority language voter

14  registration materials. Fed. Reg. Vol. 76, No. 198 at 63605 (October 13, 2011) (available at:

15  http://www.justice.gov/crt/about/vot/sec_203/2011_notice.pdf). This Court can take judicial notice of

16  the fact that Reno is located in Washoe County, not in Clark County.

17      There is no law requiring Washoe County to provide voter registration forms in Spanish.

18  Therefore the fact that certain DWSS or WIC offices in Reno did not have any Spanish forms is not

19  violation of the NVRA.

20      6.    The remaining statements in the Khan declaration do not show a violation of
            the NVRA.
21

22      First, Ms. Khan's declaration states that several of the offices she visited did not have voter

23  registration forms available in the lobby. However, the NVRA does not require this. It requires only

24  that clients be given a registration form with each application for benefits, renewal, recertification, or

25  change of address, unless the client declines in writing. 42 U.S.C. § 1973gg-5(6). Nothing in the law

26  requires agencies to place applications in the lobby, to be taken by anyone at any time.

27      Second, the declaration also states that several of the offices did not have signs posted

28  explaining that voter registration services were available. ¶¶ 6(a), 7(a), 8(a), 9(a), 10(a), 12(a). Once

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

1 | again, this is not something the NVRA requires. The NVRA only requires that the agencies "provide a

2 | form" that, among other things, informs the client that the decision to register will not affect benefits

3 | that staff will help them with the registration form, and who to contact if they feel someone has

4 | interfered with their ability to register. 42 U.S.C. § 1973gg-5(b)(6). It does not require that this

5 | information also be posted in signs in the office lobby.

6 |      Ms. Khan's declaration only shows that a small number - six out of the 38 DWSS and WIC

7 | offices throughout Nevada – did not have any signs up at the time of her particular visit. Currently, all

8 | DWSS and WIC offices have signs posted, even though this is not required by the NVRA.[3] Exhibit 6,

9 | Allard Decl. p. 1, ll. 15-17; Exhibit 7. Walker Decl. p. 1, ll. 19-21.

10 |      Finally, the declaration asserts that in two WIC locations, voter registration forms were not

11 | available.  Khan Decl. ¶¶ 8(a), 10(a). Like the other assertions, these too are hearsay. In any event, all

12 | offices now have forms available. Exhibit 7, Walker Decl. p. 1, ll. 19-21.

13 |      7.    <u>The recent declarations of three DHHS clients do not show any violation of</u>
14 |                  <u>the NVRA.</u>

15 |      Plaintiffs additionally present three declarations from DHHS clients, all executed on either June

16 | 19th or 20th, 2012. These declarations do not support Plaintiffs' request for a preliminary injunction

17 | because a more thorough review of the circumstances of each transaction shows no violation of NVRA

18 | occurred in any of these three cases.

19 |      The first declaration, from Ms. Sheila Confer, alleges that she went to the West Flamingo WIC

20 | office in Las Vegas on June 19, 2012 to recertify her benefits. Exhibit B to Memo. It asserts that Ms.

21 | Confer was never provided a form asking whether she wanted to register to vote, nor was she asked if

22 | she wanted to register, nor provided a registration form. *Id.* However, records from her visit show that

23 | she was presented with a form entitled "Nevada State WIC Rights and Responsibilities." Exhibit 7,

24 | Walker Decl., p. 2, ll. 1-5. The form asks if she would like to register to vote. *Id.* The "No" box is

25 | checked. *Id.* The document also contains Ms. Confer's signature, and the date of June 19, 2012. *Id.*

26 |      This shows that Ms. Confer in fact was given a form asking whether she wanted to register to

27 | vote, and she declined in writing to do so. As discussed above, there is no mandate in the NVRA that

---

[3] Nevada law, NRS 293.504(2)(a). does require signs to be posted. However, Plaintiffs have not alleged a cause of action under Nevada law, and in any event. Nevada law does not create a private cause of action for failure to post a sign.

1  anyone *verbally* ask whether a client wishes to register to vote. When a client declines in writing to

2  register to vote, there is no obligation to provide a voter registration form. 42 U.S. § 1973gg-5(6).

3  Therefore in Ms. Confer's case, no violation of the NVRA occurred.

4          The second declaration is that of Ms. Kendra Hulbert, who stated that she visited a DWSS office

5  in Mound House on June 20, 2012 to "recertify [her] benefits" and "change [her] address." Exhibit C to

6  Memo. However, the records of Ms. Hulbert's visit show that she was not recertifying her benefits, nor

7  changing her address. Instead, she was reporting only a change in employment. Exhibit 6, Allard Decl.,

8  pp. 1-2, ll. 25-2. This was not a covered transaction under the NVRA, which only requires forms to be

9  distributed when a client applies, renews, or recertifies benefits, or changes address, 42 U.S.C. §

10  1973gg-5(6)(A). so no violation occurred by not giving her a voter registration application.

11          The third declaration, of Denisha Phillips, states that she went to a DWSS office on Owens

12  Avenue in Las Vegas to renew her benefits on June 19, 2012. Exhibit D to Memo. Although the pre-

13  printed part of the declaration asserts that she was never presented with a form asking whether she

14  wished to register to vote, Ms. Phillips wrote in the margin that, although she was not verbally asked

15  this question, it was asked on the forms. *Id.* Therefore, according to her own declaration, she was in fact

16  presented with the question whether she wanted to register to vote. Notably, her declaration, like the

17  others, does not state whether she checked "yes" or "no" on that form. If, like Ms. Confer, she checked

18  "no," then there was no obligation under the NVRA to provide her with a voter registration form at that

19  time.[4]

20          There are no records of Ms. Phillips visiting the Owens Avenue office in June. Exhibit 6, Allard

21  Decl., p. 2, ll. 3-11. The records indicate that the most recent contact with Ms. Philips was a telephone

22  interview in April, 2012. *Id.* On the review of eligibility form she submitted in April, 2012 in

23  connection with that interview, she checked the "no" box, indicating she did not wish to register to

24  vote. *Id.*

25          In conclusion, the Plaintiffs have not shown any likelihood of success on the merits, nor even

26  raised serious questions on the merits, because a large part of their evidence relates to matters that are

27  not legally required under the NVRA. Another large part consists entirely of hearsay statements from

28

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

---

[4] Defendants have mailed each of these declarants a voter registration application to ensure they have the opportunity to register to vote. Exhibits 6, 7.

15

1  unidentified clients that they "did not see" or "could not recall seeing" a question on the form asking if

2  they wanted to register to vote, and they were not given an application. But since the question appears

3  on standardized forms, and none of these clients assert that they checked "yes" on the form, this does

4  not show any violation occurred. Finally, in the very few cases where clients allegedly did check "yes,"

5  but did not receive a form, the Defendants' records conflict with the clients' accounts of what occurred.

6  At the very most, the evidence shows that two offices did not have registration forms immediately

7  available, a matter that has already been corrected. Accordingly, Plaintiffs have not shown a likelihood

8  of success on the merits, nor raised serious questions about the merits, and therefore are not entitled to a

9  preliminary injunction.

10    8.    The SNAP / TANF policy does not show a violation of the NVRA.

11    Plaintiffs assert that the SNAP / TANF policy supports a violation of the NVRA because it

12  states that "If there is no response on the form, it is treated as a declination." *See* Memo., pp. 15-16.

13  They argue that this runs afoul of the Tenth Circuit's decision in *Valdez v. Squier*, 676 F.3d 935 (10th

14  Cir. 2012).

15    In that recent case, the Tenth Circuit became the first court of appeals[5] to decide the impact of

16  when a client does not check either the "yes" or "no" box in response to the question: "If you are not

17  registered to vote where you live now, would you like to apply to register to vote here today?" *Id.* at

18  945. The NVRA itself requires this question to be printed verbatim on the voter preference form. 42

19  U.S.C. § 1973gg-5(6)(B)(i). It also requires the statement: "IF YOU DO NOT CHECK EITHER BOX,

20  YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS

21  TIME." 42 U.S.C. § 1973gg-5(6)(B)(iii).

22    The defendants in *Valdez* argued that they were not required to give a voter application form to

23  a client who left both boxes blank, because, pursuant to the NVRA itself, this was deemed to be a

24  declination to register. *Valdez*, 676 F.3d at 945. However, the Tenth Circuit rejected this argument, and

25  held that failure to check either box constitutes only a declination *to receive assistance in filling out the*

26  *form*, but the form must still be provided. *Id.* at 945-46.

27    The court held that the plain language of the statute required the client to be provided a form,

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

28

---

[5] Besides the district court in that same case, it does not appear that any other courts have decided this issue. One other district court mentioned it, but did not decide the issue.

16

1  even if they left both boxes blank, because 42 U.S.C. § 1973gg-5(6)(A) requires a voter registration

2  application to be distributed with every application for benefits, renewal, etc., unless the client declines

3  "in writing." *Valdez*, 676 F.3d at 945-46. It reasoned that the term "in writing" should be given its plain

4  meaning. which required that the "No" box actually be checked, otherwise, leaving the boxes blank is

5  not "in writing." *Id.*

6      Thus, the Tenth Circuit concluded that failure to check either box was merely a declination of

7  receiving *assistance*, not a declination to register to vote. *Id.* at 946. Accordingly, the agency must

8  provide a voter registration form to all applicants who fail to check either box. *Id.*

9      This Court should not follow the Tenth Circuit's decision in *Valdez* because it misapplied the

10  rules of statutory interpretation, its reasoning is unsound, and it creates absurd results. "In ascertaining

11  the plain meaning of the statute, the court must look to the particular statutory language at issue, as well

12  as the language and design of the statute as a whole....." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281,

13  291 (1988). If the plain meaning of the statute is *un*ambiguous, that meaning controls. *U.S. v. Johnson*,

14  680 F.3d 1140, 1144 (9th Cir. 2012). If the literal text leads to absurd results, it does not control. *U.S. v.*

15  *Lazarenko*, 624 F.3d 1247, 1251 (9th Cir. 2010).

16      In this case, the plain meaning of the statute is that failing to check either box constitutes a

17  declination to register to vote. Subparagraph B of 42 U.S.C. § 1973-gg5(6) expressly states that failure

18  to mark either box is deemed to be a "declination *to register*" for purposes of Subparagraph C, and also

19  requires a statement to be printed on the form close to the boxes that says: "IF YOU DO NOT CHECK

20  EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED *NOT TO REGISTER TO*

21  *VOTE* AT THIS TIME." 42 U.S.C. § 1973-gg5(6)(B)(iii) (emphasis added). Contrary to the court's

22  decision in *Valdez*, both of these parts of the statute unambiguously state that failure to check a box is a

23  declination *to register*. Nowhere does the statute state that failure to check a box is merely a declination

24  *to receive assistance*. Thus it is this latter interpretation, adopted by *Valdez*, that is directly contrary to

25  the plain language of the statute.

26      In *Valdez*, the defendants argued that those two provisions of Subparagraph B essentially

27  defined the term "in writing." 676 F.3d at 946. The court rejected that argument, stating that "in

28  writing" should be given its plain meaning, and that there was no evidence Congress intended any other

meaning. *Id.* But contrary to the *Valdez* court's reasoning, there obviously is evidence that Congress intended "in writing" to have a particular meaning – the very text of the statute says that failing to check a box is "deemed" a declination *to register*, not a declination to receive assistance. Thus the language of the statute directly contradicts the notion that failing to check a box is anything but a declination to register. Accordingly, the term "in writing," if not clearly defined by the statute to include failure to check either box, is at least rendered ambiguous, in which case the "plain meaning" rule cannot be used to determine the import of "in writing." *Johnson*, 680 F.3d at 1144 (plain meaning rule applies where text is unambiguous).

Second, the *Valdez* court's reasoning is unsound because construing the failure to check either box as a declination does not render the phrase "at this time" superfluous. *See Valdez*, 676 F.3d at 946. The court stated: "As plaintiffs suggest, it is conceivable that an applicant who chooses not to register to vote 'at that time' might still be interested in receiving a mail voter registration form and completing it at another time and/or location." *Id.* However, this interpretation should be rejected because that conclusion does not follow from the statute, and it leads to absurd results.

The NVRA requires the agencies to provide a registration application with every renewal, recertification, or change of address, unless the client declines in writing. Therefore the next time the client comes in to renew, recertify, or change addresses, the agency must ask again whether the client wishes to register to vote. 42 U.S.C. § 1973gg-5(6)(B). Declining to register by failing to check either box is not treated as a declination to register to vote *forever*. The client will be asked again the next time he or she engages in a covered transaction (just as if he has checked "No"). It Thus, treating a blank form as a declination does not render the term "at this time" superfluous. Instead it gives that term its obvious meaning: the client does not want to register to vote during this particular transaction, but might the next time he comes in. When he does, he will be asked again if he wishes to register.

The *Valdez* court's reasoning creates an absurd result, because carrying this reasoning to its logical conclusion would mean that even when a client affirmatively checks "No" on the form, the agency must still provide the client with the registration form, since even by checking "No" he has only declined to register "at this time." *See Valdez*, 676 F.3d at 496. Under the *Valdez* court's reasoning, it is equally conceivable that a client who checks "No" to the question "would you like to apply to register

to vote *here today*?" is still "interested in receiving a mail voter registration form and completing it at another time and/or location." *See id.* No court has held that this is actually required, since that does not comport with the statute, which demonstrates the error of the reasoning in *Valdez*.

But more importantly, the *Valdez* decision leads to absurd results because it transforms a simple, straightforward notice into a misleading falsehood. This is illustrated by the practical issue of training. In all-capital letters, the form itself states (as mandated by the law) that failure to check either box is deemed a declination *to register to vote*. Staff must be specially trained to ignore this statement, because, under *Valdez* anyway, it is entirely false. Staff *cannot* treat it as a declination to register, because if they do, it is a violation of federal law that could subject them to costly litigation and attorneys fees. This cannot be the result Congress intended.

Third, the *Valdez* court erred in finding that, under the parenthetical of 42 U.S.C. § 1973gg-5(6)(B)(iii), "an applicant's failure to check either box on the declination form *must only* be 'deemed to constitute a declination to register for purposes of subparagraph (C),' i.e., it relieves the agency from its duty to provide the applicant with assistance in completing a voter registration form." *Id.* at 946 (emphasis added). The Subparagraph B states that the form must include:

> boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote *(failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C))*, together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME."

42 U.S.C. § 1973gg-5(6)(B)(iii) (emphasis added).

In turn, Subparagraph C requires agencies to:

> provide to each applicant *who does not decline to register to vote* the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance

42 U.S.C. § 1973gg-5(6)(C) (emphasis added).

Contrary to the *Valdez* court's conclusion, Subparagraph B does not deem a failure to check a box as a declination "only" "for purposes of Subparagraph C." *See Valdez*, 676 F.3d at 946. Instead, Subparagraph B clarifies that failure to check either box is *additionally* deemed a declination to register

1  for purposes of Subparagraph C. There is nothing in the language of Subparagraph B that supports the

2  *Valdez* court's surprising interpretation that failure to check either box is "only" a declination to receive

3  assistance, and not a declination to register to vote, as the plain language of the statute states.

4      Instead, the statute should be read according to its obvious intent: that failure to check either box

5  is deemed a declination to register to vote, not merely a declination to receive assistance filling out the

6  form. Both clients and the states should be permitted to rely on the statutorily-mandated instructions on

7  the form regarding how to treat declinations. Had Congress intended otherwise, it could have easily

8  provided that all clients must receive a form, and must be asked if they would like *assistance* in

9  registering to vote. But neither the statute, nor the mandated form, are framed this way. Both clearly

10 state that failing to mark either box is a declination "*to register*." 42 U.S.C. § 1973gg-5(6)(B)(iii). Thus

11 the plain language of the statute is directly at odds with the conclusion in *Valdez*, its reasoning is not

12 sound, and it creates absurd results. Therefore it should not be followed by this Court.

13     Finally, even if this Court follows *Valdez*, it should not issue a preliminary injunction on that

14 basis. The SNAP / TANF policy in this case was apparently last revised in July 2010. *Valdez* was

15 decided in February, 2012. Further, the conclusion in that case is such a departure from the seemingly

16 clear language of the statute that the Defendants could not have possibly anticipated that it would be

17 unlawful to treat failure to mark either box as a declination. Instead, this is a prime example of an area

18 where, had Defendants been permitted the statutory time to cure any alleged violations, the matter could

19 have been corrected without resort to litigation.

20 **IV.  Plaintiffs have not shown a likelihood that they will suffer irreparable harm.**

21     1.    <u>Individual citizens.</u>

22     Each of the Plaintiffs brings this action on their own behalf. *See* Complaint, ¶¶ 17-19. It appears

23 that they are all also purporting to bring it on behalf of their members. *Id.* In the case of La Raza, it is

24 alleged that La Raza's "constituency" includes people who have or who may receive public assistance.

25 Complaint, ¶ 17, ll. 9-14. However, the Complaint does not allege that La Raza has any "members," or

26 that any of them would have standing to sue on their own behalf. Therefore, without some showing that

27 it has members, or is the functional equivalent of a membership organization, La Raza cannot have

28 associational standing. *See Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002) (denying

1  associational standing where organization had no members and was not the equivalent of a membership

2  organization).

3      With regard to the Las Vegas NAACP, it alleged that some of its members have received or will

4  receive or apply to receive public assistance. Complaint, ¶ 18. The Reno NAACP alleges upon

5  information and belief that some of those members receive, have received, or will apply to receive

6  public assistance. Complaint, ¶ 19.

7      However, there is no individual that is a plaintiff to this suit, and the Complaint does not

8  identify any individuals who are members of the Plaintiff organizations who have allegedly been denied

9  the opportunity to register under Section 7 of the NVRA. Because Plaintiffs have not shown that at least

10  one of their members would have standing to sue in their own right, Plaintiffs lack associational

11  standing to bring these claims on behalf of such persons. *See Doe v. Stincer*, 175 F.3d 879, 887 (11th

12  Cir. 1999) (denying associational standing where association failed to show that at least one of its

13  members had Article III standing); *Fleck and Associates, Inc. v. Phoenix, City of, an Arizona Mun.*

14  *Corp.*, 471 F.3d 1100, 1105-06 (9th Cir. 2006) (organization must show that at least one of its members

15  would have standing to sue on his or her own behalf); *Arizonans for Official English v. Arizona*, 520

16  U.S. 43, 66 (1997) ("An association has standing to sue or defend in such capacity, however, only if its

17  members would have standing in their own right.").

18      This showing is necessary because, even assuming Nevada was not complying with the NVRA

19  (which Defendants very much dispute), this does not constitute irreparable harm that can be redressed

20  by the preliminary injunction sought by Plaintiffs. Even if a violation of the NVRA were shown, there

21  is no evidence that this will actually prevent some unknown person who is not a party to this lawsuit

22  from voting.  Without this showing on the part of an individual who is a member of one of the Plaintiff

23  organizations, Plaintiffs cannot show irreparable harm to any person whose rights they would have

24  standing to enforce. *Arizonans for Official English*, 520 U.S. at 66.

25      Finally, issuance of a preliminary injunction will not avoid the alleged irreparable harm. As

26  Plaintiffs themselves point out, some people who receive public assistance only renew their benefits

27  once every six months. The Motion was filed July 6, 2012, approximately 3 months before the close of

1  registration for the general election.[6] Thus, even if a preliminary injunction were issued the day the

2  motion was filed, it would "miss" a large number of people who would not need to recertify or renew

3  their benefits during that three-month window.

4      2.    The Plaintiff Organizations.

5      The Plaintiffs also claim standing in their own right, and allege that they will suffer irreparable

6  harm because they will have to divert resources to voter registration drives that would be unnecessary if

7  Nevada fully complied with the NVRA. *See* Memo., p. 18, ll. 13-26; p. 19, ll. 1-7. However, this does

8  not constitute irreparable harm.

9      First, the cases Plaintiffs cite does not stand for the proposition that the organizational Plaintiffs

10  will suffer irreparable harm by running more voter registration drives. In *Florida State Conference of*

11  *N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir., 2008), the Eleventh Circuit held that the

12  NAACP's allegations regarding diversion of resources was sufficient for *standing* purposes, which it

13  characterized as requiring "only a minimal showing of injury." The court did not reach the issue of

14  irreparable harm. *Id.* at 1167. In *Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F.Supp.2d 1320,

15  1324 (N.D.Ga. 2012), the district court was ruling on the defendant's motion to dismiss, not on a

16  preliminary injunction. Like in *Browning*, the court found that the plaintiffs had standing; it did not find

17  that they suffered irreparable harm. *Id.* at 1337.

18      Second, irreparable harm is a type of harm that cannot be compensated by monetary damages.

19  *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

20  Generally, "injuries in terms of money, time and energy, however substantial, do not constitute

21  irreparable injury." *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987). Plaintiffs

22  have only alleged harm that is monetary in nature.

23      Third, Plaintiffs have not actually provided any evidence of their alleged harm. For purposes of

24  a preliminary injunction, the Plaintiffs bear the burden of making a "clear showing" of each of the

25  *Winter* factors. *Lopez*, 680 F.3d at 1072. The Court does not simply accept their allegations as true.

26      The allegations in the Complaint indicate that each of the Plaintiffs regularly conducts voter

27  registration drives in Nevada. *See* Complaint ¶¶ 17-19; 49-56. For example, the Complaint states that

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

28

---

[6] October 7, 2012 is the last day to register by mail; October 16, 2012 is the last day to register in person. *See* NRS 293.560.

1  National Council of La Raza (NCLR) "regularly has conducted and continues to conduct" voter

2  registration drives. Complaint ¶ 50. The Las Vegas NAACP "organizes and conducts numerous voter

3  registration drives in Nevada (including, for example, conducting approximately four or five major and

4  ten to twelve smaller voter registration drives in Nevada in the last three years)." Complaint ¶ 53. The

5  Reno-Sparks NAACP "organizes and conducts numerous voter registration drives in Nevada

6  (including, for example, conducting substantial registration efforts in Washoe County during each

7  election cycle since 2004)." Complaint ¶ 56.

8          These allegations indicate that Plaintiffs conduct voter registration drives as a normal and on-

9  going part of their activities. However, they have not produced any evidence that they are actually

10  *diverting* resources to registration drives that would not have already been spent on such activities. Nor

11  have they shown that any such diversion of funds is more than de minimus or that it is actually

12  interfering with the Plaintiffs' ability to carry out other aspects of their mission. Accordingly, there is

13  no basis to find that there is any irreparable harm to the Plaintiffs as organizations.

14          3.      The balance of the hardships does not favor an injunction.

15          The balance of the hardships does not favor an injunction. As discussed above, Plaintiffs'

16  evidence does not show any violation of the NVRA at all, let alone that there is any major, systemic

17  failure to offer voter registration services at public assistance agencies. The State has presented

18  evidence that it is offering voter registration at public assistance agencies, and will continue to do so.

19  Plaintiffs have not presented any evidence of the alleged harm to the organizations themselves. Thus

20  there is little or no hardship to Plaintiffs or their members if an injunction does not issue.

21          The purpose of preliminary injunctions is usually to preserve the status quo *pendente lite*. For

22  this reason, mandatory preliminary injunctions are particularly disfavored. *Stanley v. University of*

23  *Southern California*, 13 F.3d 1313, 1320 (9th Cir. 1994). "When a mandatory preliminary injunction is

24  requested, the district court should deny such relief 'unless the facts and law clearly favor the moving

25  party." *Id.* (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1979)). Here, Plaintiffs

26  request an injunction that would require on-going monitoring and reporting by both this Court and

27  Defendants. *See* Complaint, p. 22. It would also require development of new policies and guidelines,

28  and continuing jurisdiction by the Court to ensure compliance. *Id.* at pp. 22-23.

1    Thus the injunction would be very burdensome to the Defendants, while not clearly benefitting

2    the Plaintiffs or anyone else, since it is not apparent that anyone is being denied any rights under the

3    NVRA. This is not like the cases Plaintiffs cite to, where the defendants were refusing to comply with

4    the law. *See e.g., Charles H. Wesley Educ. Foundation, Inc. v. Cox*, 324 F.Supp.2d 1358, 1367-68

5    (N.D.Ga. 2004) (balance of hardships favored plaintiffs where state refused to accept voter registration

6    forms mailed in a bundle, and voter was therefore not registered and would not be able to vote).

7         3.    The public interest does not favor the granting of an injunction.

8    As discussed above, there is no evidence that even suggests there is widespread noncompliance

9    with the NVRA. Assuming it is not simply a reporting error, the highest number of voter registration

10    applications ever received from public assistance agencies in Nevada was 39,444 over a two-year

11    period. Therefore, the Court should reject Plaintiffs' assertion that "hundreds of thousands" of

12    Nevadans' right to vote is at stake. *See* Memo, p. 19, ll. 11-13. That exaggerates both the evidence and

13    the impact, even if one were to assume that the State was refusing to comply with the NVRA altogether

14    (which obviously is not the case). Instead, an injunction would not be in the public interest because it

15    would be burdensome and unnecessary, and would cause DHHS to spend less time and resources

16    actually helping clients and more time monitoring and reporting statistics.

17         4.    The Plaintiffs do not meet the "alternative test" for a preliminary injunction.

18    As discussed above in Section II of this brief, the NVRA does not mandate that an injunction

19    must issue in every case. Therefore Plaintiffs under the NVRA are always required to meet the

20    traditional equitable requirements for a preliminary injunction.

21    To the extent the Ninth Circuit has previously allowed an alternative test that required showing

22    *only* "serious questions" on the merits and that the balance of hardships tips sharply in the plaintiff's

23    favor, those cases have been expressly overruled. *Cottrell*, 632 F.3d at 1132. Instead, all four *Winter*

24    factors must be met. *Id.* Additionally, the Ninth Circuit's "relaxed" standard which required only a

25    "possibility" of irreparable harm, instead of a "likelihood," has also been overruled. *Id.* at 1131.

26    However, the "sliding scale" test – serious questions on the merits, plus a balance of hardships that

27    sharply favors the plaintiffs – is still permissible, so long as it is used as part of the four-part *Winter*

28    test. *Id.* at 1134-35. This preserves the preliminary injunction as a drastic and extraordinary remedy that

1 | is never awarded as of right. *Winter*, 555 U.S. at 24.

2 |     As discussed above, the balance of hardships does not tip toward Plaintiffs at all. Plaintiffs have

3 | not shown that there is a single person – let alone "hundreds of thousands" – who has been deprived of

4 | the right to vote by Defendants' alleged noncompliance with the NVRA. Nor is there any evidence

5 | describing the resources and efforts of Plaintiffs spent on voter registration activities that were allegedly

6 | diverted from other activities. Thus it is impossible to say that the balance of hardships tips sharply in

7 | Plaintiffs' favor.

8 |     Finally, Plaintiffs have failed to show even serious questions as to the merits. Plaintiffs'

9 | evidence involves mostly issues that are not required under the NVRA. At the very most, Plaintiffs

10 | have shown only two or three people who might not have received a voter registration application at the

11 | time they applied or renewed their benefits. And in those cases, the evidence is conflicting. This is

12 | insufficient to warrant issuance of a preliminary injunction, even under the sliding scale test.

13 | ## CONCLUSION

14 | For the foregoing reasons, Defendants respectfully request that this Court DENY the Plaintiffs' Motion

15 | for Preliminary Injunction.

16 |     DATED this 23rd day of July, 2012.

CATHERINE CORTEZ MASTO
Attorney General

By: _____
    KEVIN BENSON
    Senior Deputy Attorney General
    Bar No. 9970
    Attorney General's Office
    100 North Carson Street
    Carson City, Nevada 89701-4717
    Attorneys for Defendants
    ROSS MILLER, Secretary of State
    and MICHAEL J. WILLDEN, Director
    of the Department of Health and
    Human Services

**CERTIFICATE OF SERVICE**

I declare that I am an employee of the State of Nevada and on this 23rd day of July , 2012, I served a copy of the foregoing Defendants' Opposition to Motion for Preliminary Injunction, by U.S. District Court CM/ECF Electronic filing to:

W. Chris Wicker, Esq.
Woodburn and Wedge
Post Office Box 2311
Reno, Nevada 89511
Email: cwicker@woodburnandwedge.com

I further declare that I am an employee of the State of Nevada and on this 23rd day of July, 2012, I served a copy of the foregoing Defendants' Opposition to Motion for Preliminary Injunction, by mailing the foregoing document via United States Postal Service to the following:

**Anson Asaka**
National Association for the Advancement of Colored People
NAACP National Office
4805 Mount Hope Drive
Baltimore, MD 21215

**Sarah Brannon**
Project Vote
1350 Eye Street, NW
Ste 1250
Washington DC. 20005

**Jamie Halavais**
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036

**Kim Keenan**
National Association for the Advancement of Colored People,
NAACP National Office
4805 Mount Hope Drive
Baltimore, MD 21215

**Bob Kengle**
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, NW
Ste 400
Washington DC. 20005

1 | **Alan Martinson**
Lawyers' Committee for Civil Rights Under Law
2 | 1401 New York Avenue NW
Ste 400
3 | Washington DC, 20005

4 | **David Rubino**
Demos
5 | 220 Fifth Avenue
6 | 2d Floor
New York, NY 10001
7

8 | **Michelle Rupp**
Project Vote
9 | 1350 Eye Street, NW
Ste 1250
10 | Washington DC, 20005

11 | **Neil Steiner**
Dechert LLP
12 | 1095 Avenue of the Americas
13 | New York, NY 10036

14

15 | Employee of the State of Nevada
Office of the Attorney General

16

17

18

19

20

21

22

23

24

25

26

27