1
2
3
4                    **UNITED STATES DISTRICT COURT**
5                        **DISTRICT OF NEVADA**
6
7  NATIONAL COUNCIL OF LA RAZA, LAS
   VEGAS BRANCH OF THE NAACP (BRANCH
8  1111), and RENO-SPARKS BRANCH OF THE
   NAACP (BRANCH 1112)
9                    Plaintiffs,                        3:12-cv-316-RCJ-VP
10 vs.                                                  **ORDER**
11 ROSS MILLER, in his official capacity as
   Secretary of State of the State of Nevada; and
12 MICHAEL WILLDEN, in his official capacity as
   Directory of the Department of Health & Human
13 Services of the State of Nevada.
14                    Defendants.
15 _____

16         Before the Court are motions for a preliminary injunction and to dismiss for failure to
17 state claim.  Plaintiffs sent a statutorily mandated notice letter to Defendant to inform him of
   Nevada's alleged violations of a federal voter registration statute, and then, per statutory
18 provision, brought this action 31 days later.  Plaintiffs seek a preliminary injunction to require
19 Defendants to immediately implement provisions required under the statute.  Defendants move to
20 dismiss, asserting Plaintiffs failed to provide proper statutory notice.  The issue is whether the
21 clock for notice starts on the date of the alleged violations or on the date of the notice letter.
22         Because Plaintiffs failed to provide proper statutory notice before filing the Complaint,
23 they lack statutory standing, and dismissal is proper under Rule 12(b)(6) for failure to state a
24 claim.  However, Plaintiffs assert that since the Complaint was filed within 30 days of the
25

1  election, and they allege *past and ongoing* violations, they are now within the 30-day statutory

2  exception to mandatory notice.  The Court disagrees and rules that Plaintiffs' tactic of delaying

3  the notice letter and then filing the Complaint within 30 days of the election cannot circumvent

4  the statutory notice requirement.  Additionally, although neither party addressed Article III

5  standing, the Court, *sua sponte,* finds Plaintiffs lack Article III standing to bring this action.

6  Finally, dismissal renders Plaintiffs' motion for a preliminary injunction moot.

7  **I.      FACTS AND PROCEDURAL HISTORY**

8              This case is about Nevada's alleged past and ongoing violations of Section 7 of the

9  National Voter Registration Act of 1993 ("NVRA"). *See* National Voter Registration Act

10  (NVRA) of 1993, 42 U.S.C. § 1973gg (1993).  The right to vote has long been recognized as

11  fundamental in order to protect the other rights guaranteed in our country.  As noted by the

12  Supreme Court in *Wesbury v. Sanders*, 376 U.S.  1, 17 (1964), "Other rights, even the most

13  basic, are illusory if the right to vote is undermined."  The Congress enacted the NVRA because

14  "[t]he right of the citizens of the United States to vote is a fundamental right" and

15  "discriminatory and unfair registration . . . procedures can have a . . . damaging effect on voter

16  participation in elections for federal office." 42 U.S.C. § 1973gg(a).  The NVRA includes

17  provisions aimed at reducing the burdens involved in registering to vote. *See id* at § 1973gg-5.

18  Primarily, Section 7 of the NVRA "[establishes] procedures that will increase the number of

19  eligible citizens who register to vote in elections for federal office." *Id.* at § 1973gg(b)(1).

20  Section 7 of the NVRA designates all offices in the state that provide public assistance as voter

21  registration agencies. *Id.* at § 1973gg-5(a)(2)(A).  Additionally, public assistance offices must

22  distribute voter registration applications and provide voter registration services with each

23  application, renewal, or change of address, unless the applicant, in writing, declines to register to

24  vote. *Id.* at 1973gg-5(6)(a)(ii).  This provision, and Plaintiffs' allegations of the state of Nevada's

25

1    noncompliance with it, is the crux of the present action.

2        Plaintiffs National Council of La Raza ("NCLR") and the Las Vegas and Reno branches

3    of the National Association for the Advancement of Colored People (individually "Las Vegas

4    NAACP," "Reno Sparks NAACP," and collectively "NAACP") have named as Defendants Ross

5    Miller in his official capacity as Secretary of State of the State of Nevada and Ross Willden in his

6    official capacity as Director of the Department of Health and Human Services of the State of

7    Nevada). (Complaint, ECF Nos.1 at 1–2).

8        On May 10, 2012, Plaintiffs sent Miller a written notice (the "Notice Letter") that Nevada

9    was not in compliance with the NVRA. (*Id.* at 2–4).  In the Notice Letter, Plaintiffs claim to have

10   discovered violations through field investigations conducted in December of 2011. (*Id.* at 2).

11   The investigations consisted of visiting Nevada's public assistance offices in three counties and

12   interviewing their clients and staff regarding the extent of assistance offered with voter

13   registration.  (*Id.* at 2–4).  The Notice Letter claims the December investigation revealed multiple

14   incidents of individuals not being offered voter registration applications. (*Id.*).  Additionally, the

15   letter alleges the state has failed to comply with the statute for years, evidenced by declining

16   voter registration statistics reported from the state's public assistance offices. (*Id.*).  The letter

17   informed Miller if he did not provide a comprehensive plan of compliance with the NVRA

18   within 20 days, Plaintiffs would have no alternative but to initiate litigation per the NVRA notice

19   provision. (*Id.* at 4).

20       On May 22, 2012, a representative from the Nevada Secretary of State's Elections

21   Division contacted Plaintiffs seeking an extension of time to investigate and respond to the

22   notice letter. (*Id.* at 17).  Plaintiffs responded in a May 24 e-mail, proposing to allow the delay if

23   Defendants would, among other things, provide current organizational charts for the various

24   public assistance offices, including management evaluation forms for those

25                          Page 3 of  31

1  Departments/Divisions. (*Id.*).  On June 5, 2012, the Election Division responded indicating it

2  would not comply with Plaintiffs' e-mail proposal. (*Id.*).  On June 11, 2012, Plaintiffs filed the

3  Complaint.

4          The Complaint alleges Nevada has disenfranchised thousands of low-income citizens due

5  to "[f]lawed practices and policies, insufficient oversight and inadequate enforcement" of the

6  NVRA. (*Id.* at 3–4).  In support of Plaintiffs' allegations, the Complaint references the stated

7  violations from the December field investigation. (*Id.* at 4–5, 15–16).  Plaintiffs claim they have

8  suffered harm due to "expending additional resources, including staff and volunteer time, on

9  efforts to assist individuals with voter registration." (*Id.* at 17–21).  Plaintiffs ask the Court to

10  declare that Defendants have violated the NVRA by failing to provide the required voter

11  registration materials and services through Nevada's public assistance offices. (*Id.* at 21–23).

12  Plaintiffs ask the Court to enjoin Defendants from failing to develop, implement, and enforce

13  practices and policies to ensure compliance with the NVRA. (*Id.* at 23).  Further, Plaintiffs

14  request the Court approve and enforce a plan of reporting and monitoring. (*Id.*)

15          On July 3, 2012, Defendants moved to dismiss the Complaint, arguing that Plaintiffs'

16  failure to comply with the notice requirement deprives them of statutory standing.  Plaintiffs'

17  response asserts continuous and ongoing violations, arguing the Notice Letter, as well as the

18  Complaint are compliant with the time requirements of the notice provision.

19          On July 6, 2012, Plaintiffs filed a motion for a preliminary injunction requiring

20  Defendants to implement the mandatory provisions of the NVRA and to take immediate remedial

21  measures to correct the alleged harm caused by Defendants' violations.  To support their

22  allegations of ongoing violations, Plaintiffs provided recent declarations by three Nevada public

23  assistance clients who claim they were not provided the opportunity to register to vote while

24  renewing their benefits—a violation of the NVRA. (Confer Decl., June 19, 2012, ECF Nos. 25-2;

25                                          Page 4 of  31

1   Hulbert Decl., June 20, 2012, ECF No. 25-3, Phillips Decl., June 19, 2012, ECF No. 25-4).

2   Defendants responded with sworn affidavits by state employees attesting they researched the

3   state records of the three declarants and discovered documentation conflicting with the

4   declarants' stated claims. (Walker Aff., July 20, 2012, ECF Nos. 32-7; Allard Aff., July 23, 2012,

5   ECF No. 32-6).

6   **II.    LEGAL STANDARDS**

7       **A.    Rule 12(b)(1)**

8       Federal courts are courts of limited jurisdiction, possessing only those powers granted by

9   the Constitution and statute. *See United States v. Marks*, 530 F.3d 799, 810 (9th Cir. 2008)

10  (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  The party

11  asserting federal jurisdiction bears the burden of overcoming the presumption against it.

12  *Kokkonen*, 511 U.S. at 377.  Rule 12(b)(1) provides an affirmative defense for lack of subject

13  matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  Additionally, a court may raise the question of

14  subject matter jurisdiction *sua sponte* at any time during an action. *United States v. Moreno-*

15  *Morillo*, 334 F.3d 819, 830 (9th Cir. 2003).  Regardless of who raises the issue, "when a federal

16  court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in

17  its entirety." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citing 16 J. Moore et al.,

18  Moore's Federal Practice § 106.66[1], pp. 106-88 to 106-89 (3d ed. 2005)).

19      **B.    Rule 12(b)(6)**

20      Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action

21  that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  A motion to

22  dismiss under Rule 12(b)(6) tests the complaint's sufficiency. *See North Star Int'l. v. Arizona*

23  *Corp. Comm'n.*, 720 F.2d 578, 581 (9th Cir. 1983).  When considering a motion to dismiss under

24  Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does

25                                  Page 5 of  31

1    not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.

2    *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   In considering whether the complaint

3    is sufficient to state a claim, the court will take all material allegations as true and construe them

4    in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th

5    Cir. 1986).   The court, however, is not required to accept as true allegations that are merely

6    conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden*

7    *State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

8          "Generally, a district court may not consider any material beyond the pleadings in ruling

9    on a Rule 12(b)(6) motion . . . However, material which is properly submitted as part of the

10   complaint may be considered on a motion to dismiss. *Hal Roach Studios, Inc. v. Richard Feiner*

11   *& Co.*, 896 F.2d 1542, 1555 (9th Cir. 1990).   Similarly, "documents whose contents are alleged

12   in a complaint and whose authenticity no party questions, but which are not physically attached

13   to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without

14   converting the motion to dismiss into a motion for summary judgment.   *Branch v. Tunnell*, 14

15   F.3d 449, 454 (9th Cir. 1994).   Moreover, under Federal Rule of Evidence 201, a court may take

16   judicial notice of "matters of public record." *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279,

17   1282 (9th Cir. 1986).   Otherwise, if the district court considers materials outside of the pleadings,

18   the motion to dismiss is converted into a motion for summary judgment. *See Arpin v. Santa*

19   *Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

20          If the court grants a motion to dismiss a complaint, it must then decide whether to grant

21   leave to amend.   The court should "freely give" leave to amend when there is no "undue delay,

22   bad faith[, or] dilatory motive on the part of the movant . . . undue prejudice to the opposing

23   party by virtue of . . . the amendment, [or] futility of the amendment . . . ." FED. R. CIV. P. 15(a);

24   *Foman v. Davis*, 371 U.S. 178, 182 (1962).   Generally, leave to amend is only denied when it is

25

1    clear that the deficiencies of the complaint cannot be cured by amendment. *See DeSoto v. Yellow*

2    *Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

3           **C.      Statutory Standing**

4           To bring an action under a federal statute, a plaintiff must not only have Article III

5    standing, but also statutory standing. *See Leeson v. Transamerica Disability Income Plan*, 671

6    F.3d 969, 976 (9th Cir. 2012); *see also Vaughn v. Bay Environmental Mgmt. Inc.*, 567 F.3d 1051,

7    1024 (9th Cir. 2009).  A Rule 12(b)(6) statutory standing dismissal for failure to state a claim is

8    proper when there are "non-jurisdictional limitations on causes of actions" to which the plaintiff

9    has not complied (such as a notice requirement). *See Leeson* at 976.

10          **D.      Article III Standing**

11          To satisfy Article III's case or controversy requirement, the litigant must establish: (1)

12   that he has suffered an injury-in-fact; (2) that the injury is traceable to the challenged action of

13   the defendant; and (3) that the injury can be remedied by a favorable decision. *Clark v. City of*

14   *Lakewood,* 259 F.3d 996, 1006 (9th Cir. 2001).  Importantly, a plaintiff "must show, first and

15   foremost, an invasion of a legally protected interest that is concrete and particularized and actual

16   or imminent.*" Arizonan's for Official English v. Arizona*, 520 U.S. 43, 64 (1997).  If a person

17   lacks Article III standing, the case is subject to dismissal for lack of subject matter jurisdiction

18   pursuant to Rule 12(b)(1). See *Maya v. Centex Corp.*, 658 F. 3d 1060, 1067 (9th Cir. 2011).

19          **E.      Preliminary Injunctive Relief**

20          A preliminary injunction is an extraordinary remedy that should not be granted unless the

21   movant can clearly show: "1) he is likely to succeed on the merits of such a claim; 2) he is likely

22   to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in

23   his favor; and 4) that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7,

24   20 (2008).

25                                    Page 7 of  31

1    **III.    ANALYSIS**

2        Section 7 of the NVRA was legislated to facilitate voter registration for traditionally

3    under-represented constituents. *See* 42 U.S.C. § 1973gg(a).  The NVRA provides a means for an

4    aggrieved person to bring suit when a violation of the statute occurs. *Id.* at § 1973gg-9(b).  Here,

5    Plaintiffs bring such an action and ask the Court for a preliminary injunction claiming irreparable

6    harm in its absence.  Defendants ask the Court to dismiss for lack of statutory standing, claiming

7    Plaintiffs did not provide proper notice before filing the Complaint. The Court, *sua sponte*, also

8    analyzes Plaintiffs' Article III standing.

9        **A.    Motion to Dismiss**

10        The NVRA provides for a private cause of action but also requires written notice be given

11    before a lawsuit is initiated. *Id.* at § 1973gg-9(b).  Defendants ask the Court to dismiss due to

12    Plaintiffs' failure to provide proper notice as required under the NVRA.  Generally, a 90-day

13    notice is required to allow the state to cure the violation(s). *Id.* at § 1973 gg-9(b)*.  If the violation

14    occurs more than 30, but less than120 days before an election, only a 20-day notice is required.

15    *Id.*  However, if the violation is within 30 days of an election, no notice is required prior to

16    commencing litigation. *Id.*  Thus, violations occurring more than 120 days before a federal

17    election require a written notice and an allowance of 90 days to remedy the problem(s). *See id.*

18        Plaintiffs' notice letter dated May 10, 2012, references a field investigation conducted in

19    December 2011. (Notice Letter, ECF Nos. 1-1 at 2).  "[T]he results of our *most recent* field

20    investigations conducted in December 2011 make clear that Nevada's public assistance offices

21    still have not achieved compliance with their obligations under the NVRA." (*Id.* (emphasis

22    added)).  It further outlines the specific findings of violations from the field investigation at

23    various offices within the state. (*Id.* at 2–3).  All of the alleged violations were from the same

24    December 2011 field investigation. (*Id.*).  The letter clearly states that it is a notice letter pursuant

25

1    to 42 U.S.C. § 1973gg-9(b) and provides a 20-day period to take corrective action. (*Id.* at 3).

2         Defendants ask the Court to dismiss for Plaintiffs' failure to provide the required 90-day

3    notice under NVRA's mandatory notice provision.  Since Plaintiffs only provided a 20-day

4    notice to correct the violations prior to filing suit, and then filed the Complaint 31days later,

5    Defendants contend Plaintiffs have not complied with the statute and thus lack standing to bring

6    an action.  Defendants argue that because the alleged violations identified in the field

7    investigations happened in December 2011, the *violations* occurred more than six months prior

8    to the June 12, 2012 primary elections, which is outside the 120-day period before a federal

9    election.  Specifically, they argue, "[n]othing in the letter or the complaint identifies any violation

10   that occurred later than December 2011." (Mot. Dismiss, ECF No. 22 at 5).

11        Plaintiffs maintain the violations of Section 7 are ongoing and continuous.  Plaintiffs

12   argue they "[a]re not required to identify separate incidents that violate the NVRA, only to give

13   notice of the violations sufficient for Defendants to correct them." (Resp. Mot. Dismiss, ECF No.

14   30 at 13).  Plaintiffs ague:

15            Under Defendants' theory, the only 'violations' that one could insert in a valid notice
             letter would be violations that arise in specific transactions, as Defendants discount
16            or ignore all other violations.  If that were the case, states could escape litigation
             simply by remedying the violations that occurred in those specific transactions,
17            hardly advancing the NVRA's stated goal of promoting voter registration.

18   (*Id* at n. 8).

19

20   Plaintiffs' reasoning fails to embrace the plain meaning and intent of the notice statute.  It is this

21   Court's reading of the provision that identifying specific violations of the NVRA and the harm

22   that arises from them is the purpose of providing notice to the state so that it can remedy the

23   harm to the person(s) through corrective measures. *See* § 1973gg-9(b).  Nevertheless, if

24   Plaintiffs' notice were proper under the statutory meaning, the foregoing discussion would be

25                              Page 9 of  31

1    immaterial to standing.  A reading of the notice provision reveals some key words which provide

2    clarity regarding the issue.

3          Appropriate analysis of questions of statutory interpretation begins with the plain

4    language of the statute.  *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009).  "It is well

5    established that when the statutory language is plain, the court must enforce it according to its

6    terms." *Id.*  Courts must also fit all parts of a statute "into an harmonious whole," if possible.

7    *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000).  "It is a

8    fundamental canon of statutory construction that the words of a statute must be read in their

9    context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dept. of*

10   *Treas.*, 489 U.S. 803, 809 (1989).

11         The statutory notice provision follows:

12   (b) Private right of action.
     **(1)** A person who is aggrieved by *a violation* of this subchapter *may* provide written
13   notice of *the violation* to the chief election official of the State involved.
     **(2)** If *the violation* is not corrected within 90 days after the receipt of a notice under
14   paragraph (1), or within 20 days after receipt of the notice if *the violation* occurred
     within 120 days before the date of an election for Federal office, the aggrieved person
15   may bring a civil action in an appropriate district court for declaratory or injunctive
     relief with respect to *the violation*.
16   **(3)** If *the violation* occurred within 30 days before the date of an election for Federal
     office, the aggrieved person need not provide notice to the chief election official of
17   the State under paragraph (1) before bringing a civil action under paragraph (2).
     (Bolded for emphasis)
18
     42 U.S.C. § 1973gg-9(b) (emphases added).
19
20         The notice provision has two broad purposes.  First, It provides a cause of action for

21   persons injured by a state's violation of the NVRA. *See id.*  Thus, a person can bring an action in

22   federal court if they can satisfy Article III standing requirements and show they have been injured

23   by the state's violation of the NVRA. *Id*.  Second, it spells out precisely when and how much

24   notice must be given before bringing an action. *Id*.  In all alleged violations, except those 30 days

25

1    prior to a federal election, the notice statute provides specific time parameters for the state to

2    investigate and cure any alleged violation before facing litigation. *Id.* Plaintiffs' contention that

3    the notice provision is not to provide notice of specific violations so the states can remedy those

4    violations and escape litigation appears contrary to the plain language above; the language clearly

5    outlines exactly that purpose: to correct the violation and avoid litigation. *See id.* Litigation is

6    costly to all parties. Arguably, the notice provision was included to not only provide standing to

7    sue in federal court, but also to deter litigation by forcing aggrieved parties to notify the state in

8    an attempt to correct the problem(s) outside the courts. *See id.* When followed, it saves time and

9    resources of extensive, and often unnecessary, litigation. However, if the properly noticed state

10   has not remedied the violation(s), the statute allows the aggrieved party to plead for injunctive

11   relief in court. *See id.*

12          In interpreting the statute, the first issue to address is whether the notice is required or

13   optional. Although Plaintiffs have not contested whether notice is required, the language could

14   be misleading and therefore should be addressed. The use of the word *may* instead of *must* or

15   *shall* in paragraph (1), while referring to the written notice, could lead one to presume the notice

16   is not mandatory. *See id.* However, when the word is read in its context and with a view to its

17   place in the overall statutory scheme (*see Davis*, 489 U.S. at 809), it is understood and

18   acknowledged that written notice is mandatory. *See Nat'l Coalition for Students with Disabilities*

19   *Educ. & Legal Def. Fund v. Allen,* 152 F.3d 283, 286 (4th Cir. 1998)*; see also Broyles v. Texas,*

20   618 F. Supp. 2d 661, 691–92 (S.D. Tex. 2009). The word *may* refers to when a violation occurs

21   within 30 days of a federal election; then, notice *may* be given, but none is required. *Allen*, 152

22   F.3d at 286. Although the Ninth Circuit has not addressed the NVRA's notice requirement, other

23   Circuits, as noted above, have. *Id.* This Court is in agreement with the Fifth Circuit's reading in

24   *Broyles v. Texas.* There, the court disagreed with the plaintiff who argued that notice under the

25

1   statute was discretionary because "a person who is aggrieved by a violation of this subchapter

2   *may* provide notice . . . ." *Broyles, 618 F. Supp. 2d* at 691.  The court stated in all other instances

3   (outside the 30-day window of an election) it is required to provide a notice letter prior to

4   commencing litigation. *Id* at 692.  The court explained that "[i]f notice was [sic] optional, the 90-

5   day cure period would be superfluous." *Id.*  This Court agrees with this district's finding.  A look

6   into the statute makes it clear, "[i]f the violation occurred within 30 days before the date of an

7   election for federal office, the aggrieved person *need not* provide notice to the chief election

8   official of the state." § 1973gg–9(b)(3) (emphasis added).  That the aggrieved person *need not*

9   provide notice before filing suit under these conditions evidences that notice is otherwise

10  mandatory. *See Broyles, 618 F. Supp 2d* at 692.

11          The next issue to determine is whether the notice letter was proper and followed NVRA's

12  notice requirements.  Miller received the notice letter dated May 10, 2012 alleging Nevada's

13  public assistance offices were *still* in violation of the NVRA. (Notice Letter, ECF No. 1-1 at 2).

14  Here, the adverb *still* refers to the time between the alleged noncompliance in 2008 and the

15  December 2011 investigation. (*Id.*).  Plaintiffs assert the letter notifies Defendants of ongoing

16  violations, as referenced by the December investigation. Following is an exert from the May 10,

17  2012 notice letter:

18          As you know, your office was first contacted about these issues in 2008, when
        DEMOS, one of the undersigned organizations, advised your office of its findings
19      concerning Nevada's noncompliance with the public agency requirements of the
        NVRA.  We very much appreciate the subsequent discussions your office has had
20      with DEMOS in an effort to improve Nevada's compliance, but unfortunately the
        results of our most recent field investigations conducted in December 2011 make
21      clear that Nevada's public assistance offices still have not achieved compliance with
        their obligations.

22  (*Id.*).

23           Defendants correctly argue the purpose of the notice letter is to identify specific

24  violations and provide the state an opportunity to correct them—in fact, that is precisely what the

25                                  Page 12 of  31

1   notice provision is in place to do.   It states "[i]f the **violation** is not corrected (within the

2   specified notice periods) . . . the aggrieved person may bring a civil action . . . for declaratory or

3   injunctive relief **with respect to the violation**." § 1973gg-9(b)(2) (emphases added).   Defendants

4   further argue that Plaintiffs did not provide proper notice in relation to the time period between

5   the violations discovered in December and the upcoming federal elections.   Plaintiffs maintain

6   the violations were ongoing at the time of the Notice Letter, and therefore notice was proper in

7   relation to the time between the Notice Letter and the election.   If Plaintiffs would have sent

8   notice to Miller immediately after the December investigation, then Plaintiffs could have

9   reasonably argued that the violations were *still* ongoing as of the notice.

10         The violations of which Plaintiffs notified Miller were alleged to have occurred in

11   December of 2011, yet the notice was not provided until May 10, 2012—five months after the

12   investigation.   The lack of urgency Plaintiffs demonstrated in providing notice to Miller indicates

13   an ulterior motive.   Otherwise, why not quickly provide notice to rectify the alleged violations?

14   The record is void of any explanation by Plaintiffs.   Yet, even with so much time having elapsed

15   sinse the initial investigation, a  follow–up inquiry of even one person to show any continuous

16   and ongoing violations would have validated Plaintiffs' Notice Letter.   Plaintiffs argue that they

17   have "unambiguously indicated in both the Notice Letter and the Complaint, that NVRA

18   violations were ongoing and were occurring well within the 120-day pre-election window **(and,**

19   **the Complaint was within the 30 day window of the June 12 primary**.)" (Resp. Mot. Dismiss, at

20   3(emphasis added)).   Plaintiffs now assert that since the Complaint alleges continuous and

21   ongoing violations, and it was filed within the 30-day window of the elections, they are within

22   their statutory rights to bring the action—even without notice.

23         The allegations in both the Notice Letter and the Complaint that Nevada's public

24   assistance offices still have not achieved compliance with the NVRA, when six months had

25

1  elapsed from the time of Plaintiffs' December field investigations to the filing of this Complaint,

2  undermines the purpose of the NVRA's notice requirement.  Further, to bring an action claiming

3  past and ongoing violations*,* yet failing to provide evidence of ongoing violations other than a six

4  month-old investigation hardly withstands the Supreme Court's requirement to avoid a dismissal

5  for failure to state a claim (wherein the non moving party must show "enough facts to state a

6  claim to relief that is plausible on its face.") *See Twombly*, 550 U.S. 544, at 570.  Here, where the

7  relief sought is compliance, without showing more recent facts of Defendants' noncompliance

8  than a five month-old investigation reduces the statement of continuous and ongoing violations

9  from a factual allegation (to be viewed in a light most favorable to the nonmoving party) to a

10  conclusory assertion (which will not withstand the requirements in *Twombly* ). *See id.*

11        The notice provision uses the word *violation* no less than six times in its three short

12  paragraphs.  See § 1973gg-9(b).  The statute specifically states "[i]f *the violation* occurred within

13  . . . " certain periods of time before an election, then a notice letter must be sent.  *Id.* (emphasis

14  added).  It states "[if] *the violation* is not corrected within . . . " the specified time, then the

15  aggrieved person may bring an action for "declaratory or injunctive relief *with respect to the*

16  *violation*." *Id.* (emphases added).  Because the NVRA's notice provision specifically outlines the

17  required timeliness of the notice, both in respect to an election and to the amount of notice

18  required, it only follows that the aggrieved person must give notice of the specific violation with

19  the date of its occurrence, and all provisional notice requirements then relate to that violation.

20  *See id.*  However, because Plaintiffs waited five months before sending the Notice Letter, they

21  left the door open to speculation as to whether the December violations are still ongoing.

22  Plaintiffs would ask this Court to rule that so long as an aggrieved person alleges in the notice

23  letter that violations are ongoing, the date of the notice letter controls for notice purposes.  In this

24  case that would include even if the violations of which the person alleges any factual knowledge

25

Page 14 of  31

1    about occurred months earlier.  The notion of such a rule is illogical and it contradicts the plain

2    language of the statute—which is concerned with the dates of the violations in respect to the

3    election dates, not the dates the notice letters were dispatched.  To enforce the statute more

4    broadly by allowing the aggrieved party to claim "continuous and ongoing" violations, when the

5    only actual alleged violations occurred months earlier, undermines the very time–sensitive

6    purpose of the NVRA's notice provision.  Therefore, the date of the alleged violations contained

7    in the notice letter in relation to the next federal election date are the only relevant dates to

8    consider in determining the adequacy of proper notice under the NVRA. *See id.*  For these

9    reasons, the Court finds the Plaintiffs failed to follow the statutory notice provisions of the

10   NVRA.

11          A Rule 12(b)(6) Dismissal for failure to state a claim is proper when plaintiff lacks

12   statutory standing and the statutory provision is not clearly jurisdictional.  *Leeson,* 671 F.3d 969

13   at 976-77.  Here, the NVRA notice provision is non–jurisdictional.  Plaintiffs failed to provide

14   proper notice as required under the NVRA's notice provision.  Therefore, Defendants' Rule

15   12(b)(6) motion to dismiss for failure to state a claim is proper because plaintiffs do not have

16   statutory standing to bring this action.

17          The next issue, regarding the timing of the Plaintiffs' action, was previously mentioned

18   but not yet analyzed.  Plaintiffs' filed the Complaint within 30 days of the June 12, 2012

19   primaries, and it contains the single allegation of past and ongoing violations. (Compl., at 2).

20   Yet, in the complaint, the only evidence of violations are in reference to the December 2011 field

21   investigations. ( *Id.* at 8-16).  The *ongoing* allegations alleged in the Complaint must, by lack of

22   any other reference, be in reference to the December 2011 violations.  At the time the Complaint

23   was filed, the referenced field investigations were more than six months old. (*Id.*).  Plaintiffs had

24   not, prior to filing this action, conducted any follow-up investigation. (*Id.*).  They submitted the

25

1  results from the December 2012 investigation and filed a complaint that mirrored the allegations

2  presented in the Notice Letter. (*Id.*).

3       Here, the issue is whether a complaint that is filed without notice, as provided under the

4  NVRA's 30-day notice exception, is in compliance with the scope of the statute if the complaint

5  merely asserts "past and ongoing violations*,"* even though the date of the investigation wherein

6  the violations were discovered falls outside the 30-day pre-election window.  The Court rules that

7  a plaintiff fails to comply with the NVRA's notice provision under such conditions.  However, as

8  mentioned above, a follow–up inquiry within the 30-day window that evidences a violation will

9  satisfy the statute. *See* § 1973gg-(9)(b).  The statute does not require a *follow–up* inquiry, only

10  that the date of the violation be within a certain period of time prior to an election.  Yet, a

11  follow–up inquiry that evidences a violation will necessarily restart the clock, thus providing a

12  new date and relevant reference point for determining proper notice.

13       Plaintiffs reiterate that both in the Notice Letter and the Complaint, they allege "Nevada's

14  ineffectual public assistance voter registration program is the result of years of neglect."

15  (Compl., at 4; Not. Let., at 3–4).  Plaintiffs reference reported data from the Federal Elections

16  Assistance Commission where the state showed 10 years of declining numbers of voters who

17  were registered through the public assistance offices. (Compl., at 14).  The number of

18  registrations reached a peak of 39,444 voter registration applications in the reporting period of

19  2001–2002 and thereafter declined to 1,677 in the most recent 2009–2010 reporting period. (*Id.*).

20  The peak of 39,444 is clearly an outlier in the table provided where the next highest amount of

21  registered voters is 13,200 in the 1995–1996 season, and all the rest of the years are closer to the

22  1,677 low. (*Id.*).  Plaintiffs use this data to conclude that "[t]hese numbers paint a dismal picture

23  of Nevada's compliance with the NVRA's public assistance agency registration requirements."

24  (*Id.*).  The Court disagrees and finds the data could evidence a number of possible underlying

25

1  causes, some of which would have nothing to do with Nevada's noncompliance with the NVRA.

2  The data alone may be consistent with a violation, but under Twombly more facts are needed to

3  argue the plausibility of Nevada's alleged violations.  *See Twombly,*   In fact, NCLR proclaims in

4  the Complaint that "[a]s a means of improving opportunities for Hispanic Americans, NCLR has

5  been a strong advocate for citizens to participate in the electoral process." (Compl., at 17).  The

6  Complaint continues, "NCLR encourages Hispanic voter registration and participation,

7  particularly among the low–income citizens . . . [thus] NCLR regularly has conducted and

8  continues to conduct voter registration drives in the state of Nevada (including, for example,

9  registering over 21,500 voters in Nevada since 2008." (*Id.*).  Similarly, the Las Vegas NAACP

10  stated it "organizes and conducts numerous voter registration drives in Nevada (including, for

11  example, conducting approximately four or five major and ten to twelve smaller voter

12  registration drives in Nevada in the last three years.)" (*Id.* at 19). The Reno–Sparks NAACP

13  stated similar claims as the Las Vegas branch. (*Id.* at 20).  Therefore, it is possible the decline in

14  the number of registrations culminating from Nevada's public assistance offices over the years is

15  due to Plaintiffs positive efforts in assisting with large numbers of voter registrations. (*See id.*).

16  The following simple logic supports the Court's reasoning. The facts show that Plaintiffs are

17  conducting voter registration drives among Nevada's low–income communities (NCLR

18  registering 21,500 voters since 2008), which, by the registration drive's very existence, would

19  necessarily reduce the numbers of applicants at the state offices of public assistance.  The facts

20  also show that Defendants are providing their clients with applications to register to vote (EAC

21  data validates the same).  Therefore, it is likely that the reduction in reported numbers is due to

22  Plaintiffs' positive efforts rather than Defendants' alleged failings.  Thus, the Court finds

23  Plaintiffs' assertions of Nevada's ongoing noncompliance with the NVRA from this evidence are

24  conclusory.

25

Page 17 of  31

1    Moreover, though the Notice Letter and Complaint contain broad assertions of Nevada's

2 ongoing noncompliance with the NVRA, it wasn't until Plaintiffs moved the Court for a

3 preliminary injunction that they provided more specific evidence (including names and dates) to

4 support their assertions. (Confer Decl.; Hulbert Decl.; Phillips Decl.).  More than a week after the

5 June Complaint was filed, in an attempt to bolster their motion for a preliminary injunction,

6 Plaintiffs hastily scrambled three witnesses to sign a pre-printed declaration to attest the

7 violations were, indeed, continuous and ongoing. (*See Id.*)  These people claimed they were not

8 offered voter registration applications in the public assistance offices in both Las Vegas and

9 Carson City. (*Id.*).  Also attached was a declaration by the person who conducted the December

10 2011 field investigations. (Khan Decl., July 6, 2012, ECF Nos. 25-1).  Included in her statement

11 were accounts of two other named public assistance clients who claimed to have checked 'Yes'

12 to the voter preference question, but did not receive applications. (*Id.* at 4–5).  One claims to

13 have never received an application and the other claimed the employee told her she would mail

14 her an application at a later date. (*Id.*).

15    The Defendants, upon reviewing the declarations, investigated internal records of each of

16 the declarants and responded to the Plaintiffs' motion with sworn affidavits. (Allard Aff., July

17 23, 2012, ECF Nos. 32-6; Walker Aff., July 20, 2012, ECF No. 32-7).  In each case, the

18 declarants' paperwork showed they had actually checked and initialed the "no" box (indicating

19 they would *not* like to register to vote). (*Id.*).  By so doing, under the NVRA, no voter registration

20 forms are required to be provided to the clients. *See* § 1973gg-5(6)(A)(ii).

21    The Court finds that Plaintiffs' tactics of delaying the Notice Letter for five months in

22 order to provide almost no notice (20 days) before commencing litigation, and then, without a

23 single follow-up inquiry, filing this Complaint (claiming ongoing violations in order to be within

24 the 30-day "no notice" exception) violates the purpose of the NVRA's notice provision; which is

25

1  to provide notice of violations long before election day so the state can investigate and cure them

2  without the delay and expense of litigation.  For the aforementioned reasons, the Court rules that

3  Plaintiffs have failed to comply with the notice provision of the NVRA and, thus, Defendants'

4  motion to dismiss is granted.

5      **B. Article III Standing**

6      Federal courts are courts of limited jurisdiction, possessing only those powers granted by

7  the Constitution and statute. *See United States v. Marks*, 530 F.3d 799, 810 (9th Cir. 2008)

8  (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  The party

9  asserting federal jurisdiction bears the burden of overcoming the presumption against it.

10 *Kokkonen*, 511 U.S. at 377.  Federal Rule of Civil Procedure 12(b)(1) provides an affirmative

11 defense for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  Additionally, a court

12 may raise the question of subject matter jurisdiction *sua sponte* at any time during an action.

13 *United States v. Moreno-Morillo*, 334 F.3d 819, 830 (9th Cir. 2003).  Regardless of who raises

14 the issue, "when a federal court concludes that it lacks subject-matter jurisdiction, the court must

15 dismiss the complaint in its entirety." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citing

16 16 J. Moore et al., Moore's Federal Practice § 106.66[1], pp. 106-88 to 106-89 (3d ed. 2005)).

17     In order to bring an action in federal court, Article III requires there exist a case or

18 controversy.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  Thus, the core

19 component of standing is the case or controversy requirement. *Id.*  As defined in *Lujan,* the

20 irreducible constitutional minimum of standing contains three elements: (1) that plaintiff has

21 suffered an injury–in–fact; (2) that there is a causal connection wherein the injury is traceable to

22 the challenged action of the defendant; (3) that it's likely the injury can be remedied by a

23 favorable decision. *Id.*  Here, while all three Plaintiffs claim to have suffered harm from

24 Nevada's failure to comply with the NVRA, the facts show Plaintiffs have neither sustained harm

25

*Page 19 of  31*

1   sufficient for individual standing, nor obtained associational standing on behalf of a harmed

2   member of their organizations.  Plaintiffs argue they have suffered injury by expending additional

3   resources, including staff and volunteer time, on efforts to assist individuals with voter

4   registration. (Compl., at 17–20).  The NAACP additionally claims their members have been

5   harmed by not being offered the opportunity to register to vote through Nevada's public

6   assistance offices. (*Id.*, at 18–21).

7          Though this is a case of first impression in the Ninth Circuit, there is a case directly on

8   point from the Fifth Circuit.  In that case, the Association of Community Organizations for

9   Reform Now ("ACORN") sued a Louisiana official for roughly the same violations of the

10  NVRA. *See Ass'n of Cmty. Orgs for Reform Now v. Fowler,* 178 F.3d 350, 354–55 (5th Cir.

11  1999).  In *Fowler*, ACORN's standing was at issue. *Id.*  ACORN supported its claim that it

12  suffered an injury sufficient enough to meet the Article III standing requirements with three

13  categorical arguments. *Id.* at 358.  First, that it had expended resources litigating Louisiana's

14  alleged failure to implement the NVRA; second, that it had expended resources to monitor

15  Louisiana's implementation of the NVRA; and third, that it had expended resources registering

16  voters. *Id.*

17         Here, since Plaintiffs' standing was not challenged by Defendants, they have not provided

18  arguments defending their constitutional standing.  The facts are similar to *Fowler*, though, and it

19  is likely similar defenses would be raised if their standing were challenged.  In *Fowler*, the court

20  rejected ACORN's first two arguments. *Fowler*, 178 F.3 at 354.  The *Fowler* court followed

21  Supreme Court precedent in that one cannot fabricate standing through self-inflicted injury. *Id.*;

22  *see also Bennett v. Spear*, 520 U.S. 154, 162 (1997).  The Court in *Bennett* held that the pursuit

23  of litigation alone cannot constitute an injury sufficient to establish standing under Article III.

24  *Bennett* at 520 U.S 154 at 162*; see also Spann v. Colonial Village Inc.*, 899 F.2d 24, 27 (D.C.

25                                      Page 20 of  31

1  Cir. 1990) ("An organization cannot, of course, manufacture the injury necessary to maintain a

2  suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant

3  could create injury in fact by bringing a case, and Article III would present no real limitation.").

4  Ultimately, Fowler held that unless ACORN could produce evidence that it would have been

5  using its resources differently had Louisiana been in compliance with the NVRA, it lacked injury

6  sufficient for Article III standing. *Fowler*, 178 F.3d at 359.  This Court agrees with *Fowler* in its

7  application of *Bennett* regarding the rejection of ACORN's claim to injury from self-inflicted

8  expenditures and would hold likewise if Plaintiffs brought similar arguments.

9        Plaintiffs' claimed injury and assertions of causation, "[b]ut for defendants' violations of

10  the NVRA, . . . volunteers and members would not have expended as much of their limited

11  resources assisting these Nevada citizens with voter registration,"  is directly on point with

12  ACORN's third argument. (Compl., at 20).  Likewise, ACORN argued it suffered the injury

13  necessary for standing by expending resources to register voters that it would have otherwise

14  allocated to other activities.  *Fowler*, 178 F.3d at 360.  The *Fowler* court upheld ACORN's

15  standing with respect to setting up voter registration tables within Louisiana's welfare waiting

16  rooms, unemployment offices, and on Food Stamp lines. *Id.* at 361.  However, the court

17  specifically rejected ACORN's "allegations of injury due to including voter registration

18  applications with its membership applications or setting up a voter registration table at housing

19  fairs *that it already attends* suffice to confer standing on ACORN to sue on its own behalf." *Id.* (

20  emphasis added)  Here, the NCLR and both branches of the NAACP claim they expended

21  additional resources, including staff and volunteer time, on efforts to assist individuals with voter

22  registration who should have been offered registration through Nevada's public assistance

23  offices. Yet, by their own declarations in the Complaint, Plaintiffs objectives and practice are to

24  conduct numerous voter registration campaigns in the state of Nevada. (*Id.*).  The difference

25

1   between ACORN's and Plaintiffs' facts are significant.  ACORN actually conducted voter

2   registration drives within the public assistance offices, whereas here, Plaintiffs did not.  *See*

3   *Fowler*, 178 F.3d, 359–61.  The court reasoned because ACORN would not have conducted its

4   voter registration drives within the public assistance offices but for ACORN's belief that

5   Louisiana was not in compliance with section 7 of the NVRA, those voter registration drives

6   were expenditures and resources that would have otherwise been allocated to other activities. *Id.*

7   at 361.  Here, Plaintiff's claim makes no reference to conducting voter registration drives within

8   any public assistance offices, even though, like ACORN, Plaintiffs believed Nevada was in

9   violation of Section 7 of the NVRA by failing to provide voter assistance to public assistance

10  clients.

11          The Court finds Plaintiffs' self–described business objectives, activities, and practice

12  contradict their assertion to have spent additional resources.  Plaintiff NCLR claims it has

13  expended additional resources, including staff and volunteer time, on efforts to assist individuals

14  with voter registration.  Yet, the Complaint specifically states that NCLR ". . . has been a strong

15  advocate for citizens to participate in the electoral process.  NCLR encourages Hispanic voter

16  registration and participation, particularly among low-income citizens." (*Compl.* at 18).  Further,

17  the Complaint states, "NCLR regularly has conducted and continues to conduct voter registration

18  drives in Nevada (including, for example, registering over 21,500 voters in the sate of Nevada

19  since 2008)." (*Id.* at 17).  Because registering Hispanic American voters is an admitted tenet of

20  NCLR, and it regularly has conducted voter registration drives, NCLR has failed show any

21  "concrete and particularized" facts that they have conducted any voter registration drives other

22  than what they would have done had Nevada been in compliance with the NVRA.  Thus,

23  NCLR's claim of harm due to expending additional resources because of Nevada's alleged

24  noncompliance with the NVRA is not substantiated by any facts in the Complaint. (*See* Compl.).

25                                          Page 22 of  31

1  Therefore, because NCLR has not shown they have suffered an injury-in-fact causally connected

2  to Nevada's alleged noncompliance with the NVRA, they lack standing to be a party to this suit

3  under Article III and will be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction.

4  *See Lujan*, 504 U.S. at 560.

5         Plaintiffs Las Vegas and Reno branches of NAACP specifically allege harm because

6  "Nevada's continuing violations of Section 7 of the NVRA have frustrated the Las Vegas

7  NAACP's efforts, as low-income citizens and citizens of color have been deprived of

8  opportunities to register to vote at DHHS offices." (Compl. at 18–20).  Additionally, comporting

9  with the specific assertions of the NCLR *supra*, Las Vegas and Reno NAACP allege the same

10  harm, "but for defendants' violations of the NVRA, NAACP volunteers and members would not

11  have expended as much of their limited resources assisting these Nevada citizens with voter

12  registration." (*Id.*).  Yet, similar to NCLR's declarations, both branches of NAACP state they

13  "organize and conduct numerous voter registration drives in Nevada (including, for example,

14  conducting approximately four or five major and ten to twelve smaller voter registration drives in

15  Nevada in the last three years)." (*Id.*).  Further, NAACP branches state they "[d]evote substantial

16  resources to voter registration drives every year, including recent and present efforts  registering

17  voters at grocery stores, parks, and libraries in low-income neighborhoods." (*Id.*).  Unlike NCLR,

18  NAACP branches attempt to offer some specific facts to show how Nevada's alleged violations

19  have harmed them in their "ongoing" voter registration programs.  (*Id.*).  NAACP branches

20  allege that in "promoting these drives, the NAACP organizers target, among others, families who

21  live in low income housing." (*Id.*).   NAACP states, "If public assistant offices throughout

22  Nevada were complying with the requirements of the NVRA, the branches of NAACP would

23  expend fewer resources on voter registration drives in communities where DHHS clients should

24  be offered voter registration opportunities at DHHS offices."  (*Id.*).  It is plausible that NAACP

25

1    branches have suffered harm of having to focus their drives in low-income communities if they

2    would have otherwise focused elsewhere, which they claim.  However, they state that low-

3    income communities have been the focus of their "numerous" drives during the past three years.

4    (*Id.*).  It appears, based on NAACPs' own declarations, they were doing business as usual;

5    whether Nevada was in compliance or not.  (*See Id.*) (Since the NAACP has been conducting

6    voter registration drives in the low-income communities for at least two years prior to their "field

7    investigation," Plaintiffs business objectives, including budgets and expenditures, included these

8    voter registration drives).  Thus, the NAACP has failed to show "concrete and particularized"

9    facts that they have conducted any voter registration drives other than what they would have done

10   had Nevada been in compliance with the NVRA.  Therefore, like the NCLR *supra*, Plaintiffs

11   NAACP lack standing by not satisfying Article III's case and controversy requirement.

12          However, Unlike the NCLR, The NAACP claims members of their organizations have

13   been harmed due to Nevada's noncompliance, thereby providing associational standing to bring

14   the action. (See Compl., at 19–21).  Plaintiffs, NAACP state:

15          NAACP members , including individuals who have not been and will not be offered
            the opportunity to vote through DHHS offices, are harmed by defendants violations
16          of the law, and will continue to be so harmed until defendants are required to comply
            with Section 7 of the NVRA.  This includes members who are not registered to vote
17          and members who are registered to vote but have moved or will move and thus have
            an interest in promptly receiving information and assistance regarding changing their
18          voter registration to match their new address.

19   (*Id.*).

20

21          In order to acquire associational standing on behalf of the members of an organization,

     there are three defined requirements.  *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S.
22
     333, 383 (1977).  The Supreme Court in *Hunt* stated:
23
     [a]n association has standing to bring suit on behalf of its members when (a) its members would
24   otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to

25                                        Page 24 of  31

the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members.

*Hunt,* 432 U.S. at 383 (quoting *Warth v. Seldin*, 422 U.S. 490 (1975).  The first prong of the

*Hunt* test is a traditional standing inquiry grounded in the Article III case or controversy

requirement. *Id.  Hunt* does not require that the organization has suffered injury *Id.*  Rather, the

organization must establish the members it represents have suffered injury sufficient to confer

standing. *See id.*  The organization need not establish that a significant number of its members

have suffered injury; injury to a single member will suffice.  *Id.*  However, that member must be

specifically identified.  *Summers v. Earth Island Institute*, 555 U.S. 488 (2009).  This case is on

point with the issues here regarding associational standing.  In *Summers*, the Congress had

enacted the Forest Service Decision Making and Appeals Reform Act. *Id.*  Among other things,

this required the Forest Service to establish a notice, comment, and appeal process for proposed

activities and projects as well as filing an environmental impact statement (EIS). *Id.*  The Forest

Service had adopted a rule that certain fire rehabilitation projects which did not cause a

significant environmental impact would be categorically exempt from the requirement to file an

EIS. *Id.*  In 2002, a fire burnt an area of Sequoia National Forest and the Forest Service

designated a timber salvage sale project which was exempt from an EIS. *Id.*  Earth Island

Institute brought suit on behalf of one of its members and had established standing based on the

alleged harm to the named affiant. *Id.*  His intention was to visit the area and his enjoyment of the

floral and fauna would be in jeopardy if the Forest Service proceeded with their plans. *Id.*  The

Forest Service settled with the affiant at the district level*. Id.*  Yet, Earth Island institute

continued adjudicating the issues based on the harm to members in future salvage projects. *Id.*

The Court found that because the original affiant had settled,  there was no longer a case or

controversy with his issues. *Id.*  The affiant, thus, no longer met the immediacy and redressability

1   requirements and, therefore, no longer had standing. *Id.*  Since Earth Island had not named

2   another specific member, the Court found they no longer had associational standing to continue

3   with the suit. *Id.*  The decent in *Summers* argued that ". . . accepting the organization's self-

4   description of the activities of its members, there is a statistical probability that some of those

5   members are threatened with concrete injury." *Id.*  The dissent offered the Sierra Club's

6   pleadings as a basis for the logic underlying probability. *Id.* The dissent reasoned that with

7   700,000 members nationwide, including thousands in the state of California, who use and enjoy

8   the Sequoia National Forest, it is statistically probable that at least one will venture on to a small

9   tract that the Forest Service is rehabilitating and suffer concrete harm as a result. *Id.*   Justice

10  Scalia, writing for the majority, responded:

11          This novel approach to the law of organizational standing would make a mockery of
            our prior cases, which have required plaintiff-organizations to make specific
12          allegations establishing that at least *one identified* member had suffered or would
            suffer harm. In *Defenders of Wildlife, supra,* at 563, we held that the organization
13          lacked standing because it failed to "submit affidavits ... showing, through specific
            facts ... that one or more of [its] members would ... be 'directly' affected" by the
14          allegedly illegal activity.

15  *Id.* at 498.

16          Even if the NAACP shows facts in the Complaint that have potentially harmed their

17  members, they fail to name any who is a member of their organization that was harmed due to

18  Nevada's alleged noncompliance with the NVRA.  Furthermore, the persons named in Plaintiffs'

19  motion for a preliminary injunction, who signed declarations stating they were not provided voter

20  registration applications, were not identified as members of the NAACP. (*See* Mot. Prelim. Inj.,

21  at 2-4).  Plaintiffs fail the first prong of the *Hunt* factors by not identifying a specific member

22  who has been harmed by Nevada's alleged noncompliance with the NVRA.  The Court will not

23  entertain the balance of the *Hunt* factors of associational standing and their application to the

24  NAACP in this case.

25                          Page 26 of  31

1    For the above stated reasons, the Court holds that Plaintiffs NAACP lack Article III

2    associational standing to bring this action in federal court.

3    **C. Motion for Preliminary Injunction**

4    Because the motion to dismiss is granted, there is no case or controversy wherein

5    irreversible harm will occur.  Therefore, the preliminary injunction is moot.  However, the Court

6    will discuss Plaintiffs' motion for a preliminary injunction for the record.

7    "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be

8    granted unless the movant , by a clear showing, carries the burden of persuasion.'" *Lopez v.*

9    *Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972

10   (1997)).  This burden requires the plaintiff to show: "1) he is likely to succeed on the merits of

11   such a claim; 2) he is likely to suffer irreparable harm in the absence of preliminary relief; 3) the

12   balance of equities tips in his favor; and 4) that an injunction is in the public interest." *Id.* (citing

13   *Winter v. National Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  All four of the *Winter* factors

14   must be met. *Alliance for the Wild Rockies v. Cotrell,* 632 F.3d 1127, 1132 (9th Cir. 2011).  Yet,

15   these factors may be balanced against each other so that a stronger showing on one factor may

16   offset a weaker showing on another. *Id.* at 1131–32.

17   Plaintiffs argue that courts in the Ninth Circuit recognize two standards for evaluating

18   claims for injunctive relief.  Plaintiffs contend "[i]t is a well–established rule that where

19   Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff

20   need not demonstrate irreparable harm to secure an injunction." (Mot. Prelim. Inj., at 11).

21   "Where, as here, Congress expressly provides for injunctive relief to prevent violations of a

22   federal statute, the 'standard requirements for equitable relief need not be satisfied . . . .'" (*Id.* at

23   10) (quoting *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (citing *Atchison,*

24   *Topeka & Santa Fe Ry. v. Lennon*, 640 F.2d 255, 259–61 (10th Cir. 1981); *United States v. City*

25   Page 27 of  31

1    *and Cnty. of S.F.*, 310 U.S. 16, 30–31, (1940)).  Plaintiffs argue the court should simply apply the

2    statute to prevent the violation.  Plaintiffs are misguided in their application of this precedent.  In

3    *Trailer Train*, the case involved the Railroad Revitalization and Regulatory Reform Act of 1976,

4    which prohibited "taxation of rail-transportation property at a higher rate than the rate generally

5    applicable to commercial and industrial property in the same assessment jurisdiction." *Trailer*

6    *Train,* 697 F.2d at 862–63.  The appellants argued that the district court erred in entering a

7    preliminary injunction without requiring plaintiffs to meet the usual standards. *Id.* at 868-69.

8    The court rejected this argument, explaining: "The standard requirement for equitable relief need

9    not be satisfied when an injunction is sought to prevent the violation of a federal statute which

10   specifically provides for injunctive relief." *Id.* at 869.  Here, Plaintiffs attempt to apply this

11   statement to the NVRA; however, it is not applicable due to differences in statutory language.  In

12   *Trailer Train*, the relevant part of the statute declared, "a district court of the United States has

13   jurisdiction . . . to grant such mandatory or prohibitive injunctive relief, interim equitable relief,

14   and declaratory judgments as may be necessary *to prevent . . . any acts in violation of this*

15   *section*." *Id.*  The court found an exception to the traditional preliminary injunction standards

16   because the statute specifically called for injunctive relief to prevent acts in violation to the

17   statute. *Id.*  The NVRA, however, does not limit courts' equity jurisdiction by mandating that

18   courts enter a preliminary injunction whenever a violation has occurred or is threatened. *See* §

19   1973gg-(9).  Courts "do not lightly assume that Congress has intended to depart from established

20   principles [of equitable discretion]." *Owner Operator Indep. Drivers Ass'n Inc. v. Swift Transp.*

21   *Co., Inc.*, 367 F3d 1108, 1112 (9th Cir. 2004) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S.

22   305, 313 (1982)).  "Therefore, unless a statute in so many words, or by a necessary and

23   inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction

24   is to be recognized and applied." *Id.* (internal quotation marks omitted).  Further, a federal judge

25

is not mechanically obligated to grant an injunction for every violation of law. *See Weinberger*, 456 U.S. at 313.  Accordingly, just because a statute permits an injunction as one form of remedy, this is not sufficient to find that Congress intended to constrain the equity jurisdiction of the courts, and thus, dispose of balancing the traditional preliminary injunction factors. *Swift Transp.*, 367 F.3d at 1115.  For these reasons, the Ninth Circuit in *Swift Transportation* affirmed the district court's use of the traditional balancing factors of a preliminary injunction. *Id.*  The statute in question in *Swift Transportation* is similar in wording to the NVRA statute.  It reads, "A person injured because a carrier [violates the Truth-in-Leasing regulations] may bring a civil action to enforce [the regulations].  *A person may bring a civil action for injunctive relief for violations [thereof]*." *Id.* at 1114 (alterations and emphasis in original).  The court reasoned:

> While this language clearly authorizes injunctive relief, it plainly does not, "in so many words, or by a necessary and inescapable inference," require an injunction to issue to prevent violations of the Truth-in-Leasing regulations irrespective of traditional equitable considerations.

*Id.*

Similarly, the NVRA provides in relevant part: "the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." 42 U.S.C. § 1973gg-9(b)(2).  As in *Swift Transportation*, there is nothing in the NVRA that requires an injunction to issue irrespective of traditional equitable considerations in order to prevent the violation(s). *Id.*  For these reasons, the Court will use the four *Winters* factors in evaluating Plaintiffs' motion for a preliminary injunction.

The first factor to consider is whether Plaintiffs are likely to succeed on the merits of their claim. *See Winter*, 555 U.S. at 20.  Plaintiffs, to support their claims of Nevada's systemic failures under the NVRA, and needed urgency for an injunction, provide statistics from the U.S. Census Bureau which shows that only 47.6% of eligible Nevada citizens who live in households

1   earning $25,000 a year or less are registered to vote, compared to 72.4% of eligible citizens

2   living in households earning $100,000 a year or more.  Plaintiffs allege this "voter registration

3   gap" show past and ongoing noncompliance with the NVRA.  The Court finds these statistics are

4   conclusory and do not plausibly indicate that Nevada is not in compliance with the NVRA.  First,

5   the data is from 2010 and earlier, which does not provide any measurement of Nevada's present

6   state of affairs.  Second, the fact that a lower percentage of people living in lower income

7   households are registered to vote than people living in a higher income households does not

8   demonstrate any causal link between this data and any alleged noncompliance by Defendants of

9   the NVRA.  In fact, the figures Plaintiffs rely on for alleging Nevada's noncompliance with the

10  NVRA are similar to the "voter registration gap" that exists nationally.  Defendants point out,

11  according to 2010 U.S. Census Bureau national statistics, 58.1% of persons living in households

12  with earnings under $20,000 were registered to vote and 79.9% of persons living in households

13  with earnings over $100,000 were registered to vote.  Nationally there is a "voter registration

14  gap" of 21.8% compared to Plaintiffs' findings in Nevada of 24.8%.  Thus there is a 3 percent

15  difference between Nevada and the national average.  Plaintiffs also rely on data from the

16  Elections Assistance Committee ("EAC") which reports the number of voter registration

17  applications submitted from public assistance offices.  Like the Census Bureau data, the most

18  recent data is at least two years old.  Plaintiffs contend Nevada is in noncompliance as evidenced

19  by the declining numbers of reported applications even though there has been a large increase of

20  people on welfare over the same period of time.  Defendants, however, contend the numbers are

21  incomplete due to a number of counties not reporting, as well as containing obvious errors with

22  outlying numbers.  Perhaps, as discussed *supra*, an equally conclusory explanation for the

23  declining numbers of applications generated through the public assistance offices is the result of

24  Plaintiffs' success in conducting voter registration drives in the low-income communities.

25

Page 30 of  31

1 | Additionally, as discussed *supra*, Plaintiffs' affidavits concerning failures to present an

2 | opportunity to register are not credible.

3 |       In addressing the second factor of the *Winter* test, the Court finds Plaintiffs will not suffer

4 | irreparable harm in the absence of a preliminary injunction. There are two potential harms which

5 | could occur in denying this motion. First, Plaintiffs have claimed harm due to expending

6 | additional resources due to Nevada's noncompliance with the NVRA. The alleged harm to the

7 | Plaintiffs' organizations is questionable factually and is monetary in nature, and therefore not

8 | irreparable. Second, Plaintiffs claim hundreds of thousands of low-income Nevadans will be

9 | deprived voter registration rights absent preliminary injunctive relief. There is no evidence

10 | before the Court supporting Plaintiffs' assertion that this harm will occur. Plaintiffs, therefore,

11 | do not meet the second factor of the *Winter* test, which requires showing the likelihood of

12 | irreparable harm in the absence of a preliminary injunction.

13 |       The final two *Winter* factors do not require an analysis, as the Motion fails under the first

14 | two factors. For these reasons, if the issue were not moot, the Court would deny Plaintiffs'

15 | motion for a preliminary injunction.

16 | **CONCLUSION**

17 |       IT IS HEREBY ORDERED that the Motion to Dismiss (ECF No. 22) is GRANTED. The

18 | Motion for a Preliminary Injunction (ECF No. 24) is DENIED as moot and on its merits.

19 | Further, the Court finds Plaintiffs lack Article III standing. The Complaint (ECF No. 1) is

20 | DISMISSED with prejudice.

21 |       DATED: December 19, 2012.

ROBERT C. JONES
Chief Judge

Page 31 of 31