**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL COUNCIL OF LA RAZA; LAS VEGAS BRANCH OF THE NAACP, Branch 1111; RENO-SPARKS BRANCH OF THE NAACP, Branch 1112, | No. 13-15077 |
| | D.C. No. 3:12-cv-00316-RCJ-VPC |
| *Plaintiffs-Appellants*, | |
| v. | OPINION |
| BARBARA K. CEGAVSKE, in her official capacity as Secretary of State of the State of Nevada; RICHARD WHITLEY, in his official capacity as Director of the Department of Health and Human Services of the State of Nevada, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted
March 12, 2015—San Francisco, California

Filed September 3, 2015

2        NAT'L COUNCIL OF LA RAZA V. CEGAVSKE
_____

Before:  William A. Fletcher and Morgan Christen, Circuit
Judges, and Roslyn O. Silver,[*] Senior District Judge.

Opinion by Judge W. Fletcher
_____

**SUMMARY**[**]
_____

**Civil Rights**

The panel reversed the district court's dismissal of a
complaint brought by the National Council of La Raza and
the Las Vegas and Reno-Sparks chapters of the NAACP
alleging that Nevada's Secretary of State and Director of the
Department of Health and Human Services violated, and
continue to violate, Section 7 of the National Voter
Registration Act of 1993.

Section 7 requires states to distribute voter registration
materials and to make assistance available to people who
visit, and make certain requests of, public assistance offices.
Plaintiffs alleged that Nevada's failure to comply with
Section 7 of the Act caused them to expend additional
resources, and that "but for" the State's failure they would
have spent these resources to accomplish other aspects of
their organizational missions, such as voter education and
registering voters not covered by the Act.  The district court

_____

[*] The Honorable Roslyn O. Silver, Senior District Judge for the U.S.
District Court for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

dismissed the complaint for lack of Article III and statutory standing.

The panel held that plaintiffs satisfied the standing requirement of Article III by plausibly alleging they suffered injury in fact fairly traceable to the State's noncompliance with Section 7 of the Act. The panel also held that plaintiffs satisfied statutory standing in two ways. First, they notified the State that violations were occurring 120 days before an election, thus authorizing them to file suit after waiting 20 days from the date of their notification. Second, they plausibly alleged that the State was violating Section 7 within 30 days of a federal election, thus permitting them to file suit without first notifying the State (even though plaintiffs in fact had done so). The panel remanded the matter for further proceedings consistent with its opinion and instructed the Chief Judge of the District of Nevada to assign the case to a different district judge.

---

## COUNSEL

Sarah E. Brannon, Project Vote, Washington, D.C.; Neil A. Steiner (argued), Dechert LLP, New York, New York; Lisa Joy Danetz, Dēmos: A Network for Ideas and Action, New York, New York; Robert Kengle and Jon M. Greenbaum, Lawyers' Committee for Civil Rights Under Law, Washington, D.C.; W. Chris Wicker, Woodburn and Wedge, Reno, Nevada, for Plaintiffs-Appellants.

Catherine Cortez Masto, Attorney General, and K. Kevin Benson (argued), Senior Deputy Attorney General, Nevada Office of the Attorney General, Carson City, Nevada, for Defendants-Appellees.

---

**OPINION**

W. FLETCHER, Circuit Judge:

The plaintiffs in this case are three civil rights organizations, National Council of La Raza ("NCLR") and the Las Vegas and Reno-Sparks chapters of the NAACP (collectively, "Plaintiffs"). They appeal the dismissal with prejudice of their complaint, which alleges that Nevada's Secretary of State and Director of the Department of Health and Human Services (collectively, "Nevada" or "the State") have violated, and continue to violate, Section 7 of the National Voter Registration Act of 1993 ("NVRA"). Section 7 requires states to distribute voter registration materials and to make assistance available to people who visit, and make certain requests of, public assistance offices. We must decide whether Plaintiffs have Article III and statutory standing to bring suit. We hold that they do and reverse the district court's dismissal of their complaint.

I.  Facts and Procedural Background

A.  The NVRA

Section 7 of the NVRA is part of a comprehensive statute designed to facilitate voter registration. The section seeks to increase registration of "the poor and persons with disabilities who do not have driver's licenses and will not come into contact with the other princip[al] place to register under this Act[, motor vehicle agencies]." H.R. Rep. No. 103-66, at 19 (1993), *reprinted* in 1993 U.S.C.C.A.N. 140, 144. To accomplish this goal, Section 7 requires states to designate public assistance offices as voter registration agencies.

52 U.S.C. § 20506(a)(2)(A).[1]  Voter registration agencies are required to "distribute" voter registration application forms with each application for assistance.  They are also required to "ma[k]e available" assistance in filling out voter registration application forms to any person who applies for public assistance or seeks recertification, renewal, or change of address, unless that person declines in writing to register to vote.  *Id.* § 20506(a)(4)(A)(i)–(iii),(a)(6).  Nevada law implementing the NVRA further obligates public assistance offices to post in conspicuous places signs informing their clients that they can register to vote and instructing them how to do so.  *See* Nev. Rev. Stat. § 293.504; Nev. Admin. Code § 293.410.

The NVRA creates a private right of action for "[a] person who is aggrieved by a violation of [the NVRA]."  52 U.S.C. § 20510(b); *see also* 138 Cong. Rec. 10,736 (1992) (statement of Sen. Wendell Ford) (explaining that the language providing for a private cause of action substituted "person" for "individual" to "permit organizations as well as individuals, and the Attorney General to bring actions under the act").  The statute includes a notice provision that requires an aggrieved person, in most circumstances, to notify state officials of possible violations of the statute before filing suit.  *See* 52 U.S.C. § 20510(b)(1).  Whether the aggrieved person is required to give notice and how long the person must wait to file suit after giving notice depends on the timing of the next federal election.  When the violation upon which a suit is based occurs a substantial time before the next federal election, the aggrieved person must notify the state of the alleged violation and must then wait 90 days before filing

---

[1] The NVRA was codified at the time of the complaint at 42 U.S.C. § 1973gg.  It is now codified at 52 U.S.C. §§ 20506–20511.

suit. *Id.* § 20510(b)(1)–(2). However, "if the violation occurred within 120 days" of a federal election, the aggrieved person must wait only 20 days after notifying the state before bringing suit. *Id.* § 20510(b)(2). "If the violation occurred within 30 days" of a federal election, the aggrieved person does not need to give any notice before bringing suit. *Id.* § 20510(b)(3).

## B.  The Notice Letter

On May 10, 2012—thirty-three days before a federal primary election—Plaintiffs sent a letter to Nevada's Secretary of State alerting him that, in the view of Plaintiffs, the State was violating the public assistance provisions of Section 7. The letter stated that "Nevada is not in compliance with Section 7" and "is systematically failing to provide the voter registration services mandated by the NVRA at its public assistance offices."

The letter provided substantial evidence in support of its allegations. First, it cited data from the U.S. Election Assistance Commission. The data showed that the number of voter registration applications submitted to Nevada public assistance offices "decreased precipitously"—by 95% from 2001–2002's high point to 2009–2010's low point—despite a four-fold increase in the number of food stamp applications during this period. Second, the letter cited U.S. Census Bureau data from 2010, which showed that only 47.6% of low-income Nevadans were registered to vote, compared to 72.4% of high-income Nevadans. Third, the letter presented the results of field investigations Plaintiffs conducted in December 2011, approximately five months before they sent the letter. Plaintiffs' investigators visited Nevada public assistance offices and surveyed the clients and clerks of those

offices.  They discovered that clerks in seven of nine offices they visited provided voter registration application forms only to people who affirmatively requested them.  Office staff indicated that this was "standard procedure."  Of the clients surveyed, only one out of the five who affirmatively requested a voter registration application form received one.  Two of the nine offices did not have voter registration application forms at all.  Only nine out of the 51 clients surveyed received voter registration application forms with their benefits applications or other forms.  Only two of nine sites displayed the notifications required by state law.

Based on this evidence, the letter concluded that Nevada is not complying with the NVRA and informed the Secretary of State that unless the State took corrective action, Plaintiffs would "have no alternative but to initiate litigation at the conclusion of the statutory 20-day waiting period."

## C.  The Complaint

On June 11, 2012—thirty-two days after Plaintiffs sent their notice letter and one day before the impending federal primary election—Plaintiffs filed a complaint in district court seeking declaratory and injunctive relief.  The complaint alleges that "Defendants have violated, and unless enjoined will continue to violate, Section 7 of the NVRA."  It alleges further that "widespread ongoing noncompliance" with, and "systemic violations" of, Section 7 are "caused by flawed practices and policies, insufficient oversight and inadequate enforcement."  The complaint alleges specifically that "[t]he violations of the NVRA described in the notice letter have not been remedied."  In support of its allegations, the complaint repeats the evidence previously laid out in the notice letter.

The complaint describes plaintiff NCLR as "the largest national Latino civil rights and advocacy organization in the United States."  According to the complaint,

> NCLR regularly has conducted and continues to conduct voter registration drives in the State of Nevada . . . .  NCLR conducts voter registration activities in two ways.  The first is through attending community events such as music festivals, sporting events, cultural fairs and national holidays and registering people as they congregate in crowds.  NCLR also registers people to vote going door-to-door . . . .

The complaint alleges that Nevada's violation of Section 7 has caused NCLR to expend additional resources in performing its voter registration mission: "Due to defendants' ongoing violations of the NVRA, NCLR has expended additional resources, including staff and volunteer time, on efforts to assist individuals with voter registration (including updating prior voter registration) who should have been offered voter registration through Nevada's public assistance offices."

The complaint describes plaintiffs Las Vegas NAACP and Reno-Sparks NAACP as organizations that "seek[] to achieve equality of rights in and around" Las Vegas and Reno-Sparks.  According to the complaint, these plaintiffs "especially encourage[] participation in federal and state elections by traditionally underrepresented groups."  Both of these plaintiffs allege that Nevada's violation of Section 7 has caused them to expend additional resources in performing

their voter registration missions.  The complaint alleges as to
plaintiff Las Vegas NAACP,

> If public assistance offices throughout Nevada
> were complying with the requirements of the
> NVRA, the Las Vegas NAACP would expend
> fewer resources on voter registration drives in
> communities where DHHS [Nevada
> Department of Health & Human Services]
> clients should be offered voter registration
> opportunities at DHHS offices.   But for
> defendants' violations of Section 7 of the
> NVRA, the Las Vegas NAACP would be able
> to allocate substantial resources to other
> activities central to its mission.

The complaint alleges the same thing as to plaintiff Reno-
Sparks NAACP.

In addition, the complaint alleges that individual members
of plaintiffs Las Vegas and Reno-Sparks NAACP have been
and will be harmed by Nevada's failure to comply with
Section 7 because their members "have not been and will not
be offered the opportunity to register to vote through DHHS
offices."   Such members include those "who are not
registered to vote and members who are registered to vote but
have moved or will move and thus have an interest in
promptly receiving information and assistance regarding
changing their voter registration to match their new address."
The complaint does not identify the members by name.

### D. Answer and Motion to Dismiss

The State filed an answer and a motion to dismiss on June 3, 2012. In its answer, the State denied that the district court had subject matter jurisdiction. In its motion to dismiss, the State contended that Plaintiffs did not comply with the notice provision of Section 7 because the alleged violations described in the complaint occurred in December 2011, when Plaintiffs conducted their field investigations. The State contended that because the violations were discovered more than 120 days before the federal primary election in June 2012, Plaintiffs were obligated to give the State 90 instead of 20 days to respond to their letter before filing suit.

### E. Preliminary Injunction and Plaintiffs' Opposition to Motion to Dismiss

Plaintiffs moved for a preliminary injunction on July 6, 2012, and submitted a memorandum opposing the State's motion to dismiss two weeks later. Plaintiffs attached both to their motion and to their memorandum declarations from individuals who are eligible to vote, who visited public assistance offices on June 19 and 20, 2012 (after Plaintiffs filed their complaint), and who were not given the opportunity to register to vote. Plaintiffs also attached to the memorandum policy manuals from the Nevada Department of Health and Human Services instructing public assistance clerks to interpret an applicant's failure to fill out the voter registration section of a benefits application as a declination to register to vote. Plaintiffs asked the district court to grant leave to amend their complaint to add allegations and supporting declarations of more recent violations if the court believed the complaint warranted dismissal without them.

The district court scheduled a hearing on the State's motion to dismiss and Plaintiffs' motion for a preliminary injunction for October 9, 2012. This date was three days after the deadline to register to vote in the November 2012 general election.

### F. *Pro Hac Vice* Applications

In August 2012, eight attorneys representing Plaintiffs *pro bono* filed applications with the district court to practice *pro hac vice* in Nevada. The State did not oppose the applications. Despite the State's failure to oppose, the district judge scheduled a hearing on the applications. At the hearing, the district judge indicated that he had not read the complaint and that he intended to deny six of the applications. He remarked that he was "not obligated to admit *pro hac vice* a lot of New York lawyers who in essence are representing their own interests, their own law firms' interests, rather than even the plaintiff that they represent." He observed that Mr. Wicker, the Nevada lawyer who was representing Plaintiffs, was "very competent." Mr. Wicker said that he appreciated the compliment, but responded,

> I have never pursued one of these Voter Registration Act cases, and I think that the public interest groups . . . have pooled their resources to pursue these cases nationwide. . . . [I]t is a specialized area where I think the help of these public interest agencies and national counsel, Mr. Steiner . . . , are very important to represent the rights of the plaintiffs in this matter.

The district judge responded that lawyers not admitted *pro hac vice* could help write briefs. Mr. Steiner expressed concern that if an associate from his office who had not been admitted *pro hac vice* took a deposition that would "put us at risk of violating Nevada unauthorized practice rules." The judge responded, "That's true."

At the end of the hearing the district judge announced his intention to grant petitions for admission *pro hac vice* for only two attorneys—one for NCLR and one for the two NAACP chapters—and gave the Plaintiffs a week to decide among themselves which attorneys to put forward. A week later, Plaintiffs moved for reconsideration of the eight applications or, alternatively, for approval of two attorneys chosen by Plaintiffs. So far as the record shows, the district court did not rule on this motion.

## G. Dismissal with Prejudice

On August 29, 2012, the parties filed stipulations in the district court under which the State withdrew its motion to dismiss and Plaintiffs withdrew their motion for a preliminary injunction. The district judge then vacated the scheduled hearing on the motions. In December 2012, without referring to the parties' stipulations, the district judge granted with prejudice Nevada's withdrawn motion to dismiss and denied as moot Plaintiffs' withdrawn motion for a preliminary injunction. The judge gave two reasons for the dismissal.

First, the district judge held *sua sponte* that Plaintiffs lacked standing under Article III. He concluded that Plaintiffs lacked organizational standing because they had not shown that they suffered an injury fairly traceable to the State. Second, the district judge held that Plaintiffs lacked

statutory standing because they complained of violations that
they knew about in December 2011, when they discovered
them in the course of their field investigations.  He concluded
that since these violations occurred more than 120 days
before the then-pending federal primary election in June,
Plaintiffs were required to give the State 90 days to respond
before filing suit.  The district judge rejected Plaintiffs'
allegation that the violations—which were alleged to be
systematic and ongoing—were still occurring on May 10,
when Plaintiffs sent their notice letter stating that the State
was then violating the NVRA, as well as on June 11, when
Plaintiffs filed their complaint alleging the same thing.
According to the district judge, Plaintiffs' decision to send
the notice letter within 120 days of a federal election was due
to an "ulterior motive."  It was a "tactic[] of delaying" that
"violates the purpose of the NVRA's notice provision; which
is to provide notice of violations long before election day so
the state can investigate and cure them without the delay and
expense of litigation."

Despite holding that Plaintiffs lacked Article III and
statutory standing, the district judge went on, in dictum, to
discuss "for the record" the merits of Plaintiffs' motion for a
preliminary injunction.  The judge concluded that, assuming
standing, Plaintiffs had not plausibly alleged that the State
was engaged in ongoing violations of Section 7 at the time
they filed their complaint.

Plaintiffs timely appealed the dismissal.

## II.  Standard of Review

We review de novo a district judge's dismissal for lack of
Article III and statutory standing, presuming that all facts

alleged in the complaint are true. *Vaughn v. Bay Envtl. Mgmt., Inc.*, 567 F.3d 1021, 1024 (9th Cir. 2009).

## III.  Discussion

### A.  Article III Standing

We disagree with the district court's conclusion that Plaintiffs lack Article III standing. The standing requirements of Article III are familiar. A plaintiff must show that (1) he or she has suffered a "concrete and particularized" injury to a cognizable interest, (2) which is "fairly traceable to the challenged action of the defendant" and (3) which likely can be redressed by a favorable decision. *Bennett v. Spear*, 520 U.S. 154, 167 (1997); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). In deciding whether a plaintiff has made this showing, we "accept as true all material allegations of the complaint" and "construe the complaint in favor of the complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

All three plaintiffs allege that Nevada's failure to comply with Section 7 of the NVRA has caused them to expend additional resources, and that "but for" the State's failure they would have spent these resources to accomplish other aspects of their organizational missions, such as voter education and registering voters not covered by the NVRA. The district judge concluded that this was not a sufficient allegation of injury in fact and causation. In his view, Plaintiffs failed to allege that Nevada's failure to comply with Section 7 had changed their behavior in any way.

As to plaintiff NCLR, the district judge noted that "Plaintiff NCLR claims it has expended additional resources, including staff and volunteer time, on efforts to assist individuals with voter registration."  Despite his recognition that plaintiff NCLR alleged in the complaint that it had expended additional resources, the district judge concluded that it had not changed its behavior.  He wrote,

> Because registering Hispanic American voters is an admitted tenet of NCLR, and it regularly has conducted voter registration drives, NCLR has failed [to] show any "concrete and particularized" facts that they have conducted any voter registration drives other than what they would have done had Nevada been in compliance with the NVRA.

As to plaintiffs Las Vegas and Reno-Sparks NAACP, the district judge noted that, like plaintiff NCLR, they alleged that they expended extra resources registering voters as a result of Nevada's alleged failure to comply with Section 7. He nevertheless concluded that the two NCAAP chapters had failed to allege that they had changed their behavior.  He wrote,

> It is plausible that [the] NAACP branches have suffered harm of having to focus their drives in low-income communities if they would have otherwise focused elsewhere, which they claim.  However, they state that low-income communities have been the focus of their "numerous" drives during the past three years.  It appears, based on [the] NAACPs' own declarations, they were doing

business as usual; whether Nevada was in
compliance or not.

The district judge's conclusion that Plaintiffs lack Article
III standing because they did not change their behavior is
based on a misreading of the complaint. The complaint,
portions of which we have quoted above, clearly alleges that
Plaintiffs changed their behavior as a result of Nevada's
alleged violation of Section 7. The complaint specifically
alleges that Plaintiffs expended additional resources that they
would not otherwise have expended, and in ways that they
would not have expended them. For example, the complaint
alleges that plaintiff NCLR "expended additional resources
. . . on efforts to assist individuals with voter registration . . .
who should have been offered voter registration through
Nevada's public assistance offices." It further alleges that
plaintiffs Las Vegas and Reno NAACP would spend "fewer
resources on voter registration drives in communities where
DHHS clients should be offered voter registration
opportunities at DHHS offices. But for defendants'
violations of Section 7," Plaintiffs "would be able to allocate
substantial resources to other activities central to [their]
mission[s]."

The Supreme Court has made clear that injuries of the sort
that Plaintiffs allege are concrete and particular for purposes
of Article III. *See Havens Realty Corp. v. Coleman*, 455 U.S.
363, 379 (1982) ("Such concrete and demonstrable injury to
the organization's activities—with the consequent drain on
the organization's resources—constitutes far more than
simply a setback to the organization's abstract social interests
. . . ."). The Court has also made clear that a diversion-of-
resources injury is sufficient to establish organizational
standing at the pleading stage, even when it is "broadly

alleged." *Id.* at 379 ("If, as broadly alleged, [defendants'] steering practices have perceptibly impaired [plaintiff organization's] ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact."); *see also Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." (internal quotation marks omitted)).

Resources Plaintiffs put toward registering someone who would likely have been registered by the State, had it complied with the NVRA, are resources they would have spent on some other aspect of their organizational purpose—such as registering voters the NVRA's provisions do not reach, increasing their voter education efforts, or any other activity that advances their goals.  Contrary to the district judge's view, Plaintiffs have not alleged that they are simply going about their "business as usual," unaffected by the State's conduct. *See Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (holding that plaintiff organizations have standing to sue to stop a roommate-matching website from discriminating because they undertook a campaign against discriminatory roommate advertising, even though their ordinary business includes investigating and raising awareness about housing discrimination).  We have no difficulty concluding that Plaintiffs have adequately alleged that the injury they suffer is attributable to the State.  *See, e.g.*, *Georgia State Conference of NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1336 (N.D. Ga. 2012) (finding that plaintiff's allegations that it expended resources, which it would have used on other

projects, to register people who should have been registered by the state "plainly satisfy the injury prong of the Article III test for standing"); *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Scales*, 150 F. Supp. 2d 845, 850 (D. Md. 2001) (finding that "the allegations that the [defendant]'s noncompliance frustrates these goals and requires the organization to expend resources in facilitating the registration of disabled persons that they otherwise would spend in other ways is sufficient to show an actual or threatened injury in fact that is fairly traceable to the alleged illegal action and is likely to be redressed by a favorable court decision ordering injunctive relief").

The complaint also alleges that members of the two NAACP chapters suffered injury as a result of Nevada's failure to comply with Section 7. Citing *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the district judge held that the chapters' members "must be specifically identified" in order for the chapters to satisfy Article III standing. We are not convinced that *Summers*, an environmental case brought under the National Environmental Policy Act, stands for the proposition that an injured member of an organization must always be specifically identified in order to establish Article III standing for the organization. The *Summers* Court refused to find standing based only on speculation that unidentified members would be injured by a proposed action of the National Forest Service. *Id.* at 498–99. Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured.

However, even if *Summers* and other cases are read to require that an organization always identify by name individual members who have been or will be injured in order to satisfy Article III, the district judge erred in dismissing the complaint without granting leave to amend.  The State agrees that leave to amend should have been granted.  Plaintiffs had specifically requested (though such a request was not necessary) permission to amend if their complaint was held insufficient.  It is black-letter law that a district court must give plaintiffs at least one chance to amend a deficient complaint, absent a clear showing that amendment would be futile.  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment."); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the [Federal Rules of Civil Procedure] require, be 'freely given.'").  The Supreme Court has recently confirmed (though such confirmation was hardly needed) that a membership organization should have the opportunity to provide evidence that bolsters its claim of associational standing when the organization reasonably believes, "in the absence of a state challenge or a court request for more detailed information," that "it need not provide additional information such as a specific membership list."  *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1269 (2015).

## B.  Statutory Standing

As a threshold matter, Plaintiffs contend that the district judge abused his discretion by granting, *sua sponte*, Nevada's withdrawn motion to dismiss on the ground that Plaintiffs lack statutory standing.  Such an action by the district court, it hardly needs saying, was unusual.  However, because we conclude on the merits that the district court erred in dismissing the complaint, we need not address Plaintiffs' contention beyond noting the unusual nature of the district judge's action.

In relevant part, the notice provision of the NVRA provides:

> (b) Private right of action
>
> (1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.
>
> (2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.
>
> (3) If the violation occurred within 30 days before the date of an election for Federal

> office, the aggrieved person need not provide
> notice to the chief election official of the State
> under paragraph (1) before bringing a civil
> action under paragraph (2).

52 U.S.C. § 20510(b).

The district judge held that Plaintiffs did not provide timely notice under the NVRA and therefore lacked standing under the statute. The State makes two arguments seeking to justify the dismissal for lack of statutory standing. First, the State argues that Plaintiffs' letter did not identify any violations of the NVRA occurring within 120 days of a federal election, and therefore Plaintiffs were required to give the State 90 days to cure, rather than the 20 days Plaintiffs actually gave. Second, the State argues that Plaintiffs did not qualify for the statute's exception to the notice requirement because Plaintiffs did not plausibly allege in the complaint, which Plaintiffs filed within 30 days of a federal election, that the State was currently violating Section 7. Both arguments rest on the same premise—that there was no reason to believe that the violations Plaintiffs identified in their December 2011 field investigations were still occurring in May 2012, when Plaintiffs sent their letter, and in June 2012, when Plaintiffs filed their complaint. We disagree with the premise.

In their May 10, 2012 letter, Plaintiffs wrote that Nevada was engaged in systematic and ongoing violations of Section 7 of the NVRA. Some of their evidence came from their December 2011 field investigations. Plaintiffs provided written notice to Nevada under paragraph (1) of § 20510(b) about six months after completing their field investigations. Their May 10 notice was provided "within 120 days before

the date of the next election for Federal office," which was to take place on June 12, 2012.  If Plaintiffs had provided notice of discrete violations that had occurred more than 120 days before June 12, but had not occurred thereafter, they would have had to wait 90 days from the date of their notice before bringing suit.  But because they provided notice within the 120-day period before June 12 and alleged in their notice that the violations were ongoing, they needed to wait only 20 days before bringing suit.

In their June 11, 2012 complaint, Plaintiffs alleged that the violations they described in their letter had not been remedied.  The complaint was filed one day before a federal election.  As in their letter, Plaintiffs pointed to the December 2011 field investigations and alleged that the systematic violations they discovered in December were ongoing. Because Plaintiffs plausibly alleged that the State was violating the statute within 30 days of a federal election, they were not required to give the State any prior notice of, or opportunity to cure, the violations alleged in the complaint.

The district judge faulted Plaintiffs for not providing notice when they completed their field investigations in December 2011.  Because Plaintiffs had not provided notice when they discovered the alleged violations, he refused to credit the allegations in the complaint that the violations were ongoing as of the date of Plaintiffs' May 10 notice letter or as of the date of the June 11 complaint.  He wrote, "If Plaintiffs would have sent notice to [Nevada's Secretary of State] immediately after the December investigation, then Plaintiffs could have reasonably argued that the violations were *still* ongoing as of the notice."  That is, because Plaintiffs did not send their notice letter in December, as soon as they discovered the alleged violations through their field

investigations, the district judge refused to believe that they were ongoing violations that continued to occur in May and June.  Nevada argues that the district judge was correct in refusing to believe that Plaintiffs had properly alleged that the violations, discovered in December, continued in May and June.

The district judge erred in concluding that the alleged violations were not plausibly alleged to be ongoing during the 120-day and 30-day periods before the June 12 election.  For example, the complaint alleges that it was "standard procedure" for office staff not to ask assistance clients if they wished to register to vote.  The complaint alleges that in each office visited by the investigators, "the clerks stated that voter registration applications are provided only to clients who check 'Yes' in response to the question whether they 'would . . . like to register to vote here today,' despite the NVRA . . . requirement that all persons engaging in covered transactions receive a voter registration form application unless they specifically decline, in writing, to receive such an application."  The complaint further alleges that two of the public assistance offices visited "did not have any voter registration applications to provide to clients who engaged in transactions covered by the NVRA."  One of the offices had not had voter registration application forms for over a year. Another office had not had the forms for over two years. Finally, the complaint alleged, "The violations of the NVRA described in the notice letter have not been remedied."

It is impossible to read these allegations and to conclude that there is no reasonable possibility that some of the violations Plaintiffs uncovered in December were continuing as of the dates of the notice and the complaint.  Indeed, given the extent and nature of the violations discovered in

December it is likely, not merely plausible, that some, perhaps all, of the violations were continuing in May and June. *See Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134–35 (9th Cir. 2014) (stating that to survive a motion to dismiss for failure to state a claim following the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), Plaintiffs' factual allegations "must . . . suggest that the claim has at least a plausible chance of success.") (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013)); *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013) ("A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" (quoting *Iqbal*, 556 U.S. at 678)).

Perhaps recognizing the weakness of the justification advanced by the district judge, the State tries to justify the dismissal on a different ground. The State argues that it is not enough for a notice or complaint to describe an ongoing violation and then to use the date of the notice or complaint as the relevant date under the statute's notice provision. The State argues in its brief to us that "a discrete violation within the applicable time period must be alleged." The State does not define what it means by "discrete violation," but we infer that the State means a violation that has been actually observed during the applicable time period. We disagree with the State.

A plaintiff can satisfy the NVRA's notice provision by plausibly alleging that a ongoing, systematic violation is occurring at the time the notice is sent or, if no notice is sent, when the complaint is filed within 30 days of a federal election. Neither the notice nor the complaint needs to

specify that the violation has been actually observed, and that there is thus a "discrete violation," during the 120-day or 30-day period. It is enough that the notice letter and the complaint plausibly allege the existence of an ongoing violation within the appropriate time period, whether or not it was "discrete" during the period. *See, e.g.*, *Scott v. Schedler*, 771 F.3d 831, 834, 840 (5th Cir. 2014) (leaving "intact the district court's determination that the NAACP has complied with the notice requirement" by alleging "systematic and ongoing violations of several provisions of Section 7 of the NVRA"); *see also Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1339 (11th Cir. 2014) (remanding to the district court to grant summary judgment to plaintiffs challenging a state's program that systematically removed suspected non-citizens from the voter rolls within 90 days of a federal election); *Valdez v. Squier*, 676 F.3d 935, 939 (10th Cir. 2012) (upholding the grant of summary judgment for a plaintiff who alleged that a state's policy caused "ongoing violations" of the NVRA).

The State argues that it would frustrate the purpose of the notice provision to permit aggrieved persons to file complaints alleging ongoing, systematic violations of the NVRA within 120 or 30 days of a federal election when they knew about the violations earlier. The State, like the district judge, is concerned that a plaintiff can avoid giving state officials notice and an adequate opportunity to cure simply by waiting to provide notice until 120 or 30 days before a federal election. To some degree, we are sympathetic with this concern. If plaintiffs discovered NVRA violations in December and waited six months to file suit, finally doing so on the day before the primary election, it is reasonable to suspect that Plaintiffs may have been seeking not only the long-term benefit of correction of the NVRA violations but

also the short-term benefit of the publicity obtained from filing suit the day before voters go to the polls. This concern, however, does not alter the meaning and operation of the NVRA.

We have two responses. First, we cannot rewrite the statute to avoid this consequence, for the statute expressly permits it. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (internal quotation marks omitted)); *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) ("[W]e assume that the legislative purpose is expressed by the ordinary meaning of the words used." (internal quotation marks omitted)). Second, the temptation to engage in strategic delay may not be as great as the State and the district judge appear to believe. Plaintiffs who seek compliance with Section 7 have good reason to air their concerns long before the 120- and 30-day clocks begin to run. Such plaintiffs are interested in maximizing voter registration. It hardly serves plaintiffs' voter registration purpose to delay notification of the State, for the sooner the State comes into compliance, the more voters will be registered. Waiting to file a complaint threatens to frustrate plaintiffs' voter registration purpose, for a late filing diminishes the likelihood that they will secure meaningful relief before voter registration closes.

## C. Leave to Amend

We hold, for the reasons given above, that Plaintiffs' complaint satisfied both Article III and statutory standing. However, assuming for the moment that the complaint was

deficient, the district judge abused his discretion by dismissing Plaintiffs' complaint for lack of standing without giving Plaintiffs an opportunity to amend. A "district court may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , [or] futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010) (quoting *Foman*, 371 U.S. at 182). However, "[a] simple denial of leave to amend without any explanation by the district court is subject to reversal." *Eminence Capital*, 316 F.3d at 1052. "Such a judgment is 'not an exercise of discretion; it is merely abuse of that discretion . . . .'" *Id.* (quoting *Foman*, 371 U.S. at 182).

## D. Reassignment

Plaintiffs have asked, in the event we reverse and remand, that we assign this case to a different district judge. We reassign only in "'rare and extraordinary circumstances,'" *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1112 (9th Cir. 2013) (quoting *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1118 (9th Cir. 2001)), such as when the district court "has exhibited personal bias," *In re Ellis*, 356 F.3d 1198, 1211 (9th Cir. 2004) (en banc) (quoting *United Nat'l Ins. Co.*, 242 F.3d at 1118), or when "reassignment is advisable to maintain the appearance of justice." *United States v. Kyle*, 734 F.3d 956, 966–67 (9th Cir. 2013) (quoting *United States v. Lyons*, 472 F.3d 1055, 1071 (9th Cir. 2006)).

We reluctantly conclude that we must reassign this case. The errors made by the district judge may suggest to a

reasonable outside observer that reassignment "to maintain the appearance of justice" is necessary.  The reasons for our conclusion are apparent from what we have written above, and we review them only briefly here.  The judge *sua sponte* sought to limit the effectiveness of representation by insisting unreasonably that only two of Plaintiffs' chosen out-of-state attorneys be given *pro hac vice* status.  *See In re United States*, No. 14-70486, 2015 WL 3938190, at *8 (9th Cir. June 29, 2015) ("At minimum, a court's decision to deny pro hac vice admission must be based on criteria reasonably related to promoting the orderly administration of justice, or some other legitimate policy of the courts." (citations omitted)).  The judge did this despite the plea of Plaintiffs' Nevada lawyer that he needed the expert assistance of out-of-state counsel who specialize in NVRA litigation, and over the objection of one of the would-be out-of-state counsel that the judge's ruling would prevent depositions from being taken in Nevada by associates in his firm.  The judge's actions came very shortly after the Ninth Circuit had deemed "troubling" his comments regarding out-of-state counsel in another case involving a different Nevada agency. *Henry A. v. Wilden*, 678 F.3d 991, 1012 (9th Cir. 2012).  Based on this and other cases, a reasonable observer could conclude that the judge's feelings against out-of-state attorneys are both well-established and inappropriately strong.  *See Great Basin Res. Watch v. United States Dep't of the Interior*, No. 3:13-CV-00078-RCJ, 2014 WL 3697107, at *3 (D. Nev. July 23, 2014) (this same judge expressly stated he would "presume[] that the out-of-state lawyers are unwilling to obey the ethical strictures that govern all other attorneys").  Further, the judge *sua sponte* and without notice dismissed Plaintiffs' case based on a motion the State had previously withdrawn, pursuant to a joint stipulation by the parties.  Still further, the judge misread the complaint when he concluded that Plaintiffs had

failed to allege that they had changed their behavior and had thus suffered no injury, when Plaintiffs had alleged that they had expended additional resources on voter registration as a result of the State's violation of Section 7. Finally, the judge dismissed the complaint without leave to amend despite Plaintiffs' explicit request that they be allowed to amend their complaint if the judge found its allegations insufficient.

Conclusion

Plaintiffs have satisfied the standing requirement of Article III by plausibly alleging they have suffered injury in fact fairly traceable to the State's noncompliance with Section 7 of the NVRA. Plaintiffs have also satisfied the statute's notice requirement in two ways. First, they notified the State that violations were occurring 120 days before an election, thus authorizing them to file suit after waiting 20 days from the date of their notification. Second, they plausibly alleged that the State was violating Section 7 within 30 days of a federal election, thus permitting them to file suit without first notifying the State (even though Plaintiffs in fact had done so). We reverse the district court's dismissal of the complaint for lack of constitutional and statutory standing and remand the matter for further proceedings consistent with this opinion. We deny as moot Plaintiffs' motion for judicial notice. We instruct the Chief Judge of the District of Nevada to assign the case to a different district judge.

**REVERSED, REMANDED and REASSIGNED.**